ESTATE OF SOPHIA P. BROWNELL, DECEASED, WELLS FARGO BANK, N.A. and WILLIAM W. BROWNELL, Executors, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Brownell v. Commissioner
Docket No. 17440-80.
United States Tax Court
T.C. Memo 1982-632; 1982 Tax Ct. Memo LEXIS 118; 44 T.C.M. (CCH) 1550; T.C.M. (RIA) 82632; October 27, 1982. R. E. H. Julien and Richard Julien, Jr., for the petitioners. Margaret A. Martin, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: Respondent has determined a deficiency of $480,447.46 in petitioners' estate tax. As a result of concessions by the parties, the issues remaining for our decision are: (1) whether certain gifts made on decedent's behalf by her conservators *119 approximately four months prior to her death were made in contemplation of her death; and (2) what was the fair market value, as of September 28, 1976, of 158,908 shares of Pope & Talbot, Inc. common stock owned by decedent on the date of her death. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Sophia P. Brownell (hereinafter Sophia) died on September 28, 1976, at age 97. Sophia's son, William W. Brownell (hereinafter William), and the Wells Fargo Bank, N.A. (hereinafter the Bank), are the executors of her estate. At the time the petition in this case was filed, William resided in Kentfield, California, and the Bank had its principal trust office in San Francisco, California. The executors timely filed a Federal estate tax return with the District Director of Internal Revenue in San Francisco. Issue 1. Gifts in Contemplation of Death
In November 1974, William and his wife moved Sophia from her apartment to the Marin Convalescent & Rehabilitation Hospital. William decided to move his mother because her memory was failing and she was no longer able to manage her apartment. When she was moved, Sophia's mental faculties had deteriorated *120 to such an extent that she was no longer aware of where she was. Much of Sophia's personal property could not be accomodated in her new residence and had to be left in her apartment. This property consisted largely of jewelry, furniture and silver, and had a value of $66,936.50. By order of December 11, 1974, the Superior Court of the State of California in and for the City and County of San Francisco, oppointed the Bank as conservator of Sophia's estate, and William as conservator of her person. The order authorized the conservator of the estate to continue the pattern of family gifts established by Sophia. From 1968 through 1975 Sophia had made annual gifts of stock, and occasionally cash, to her children and grandchildren. Sophia gave her three children just under $3,000 apiece each year, and gave an additional $18,000 a year, divided per stirpes, to her eight grandchildren. [1]
In March 1975, Sophia's apartment was sold by her conservators. The sale of Sophia's apartment made it necessary to make some disposition of the personal property that remained in her apartment. The *121 conservators considered and rejected the options of putting Sophia's property in storage, because of the expense, and of selling the property, because of its personal nature. It was therefore decided to distribute the property in equal shares to Sophia's three children and their offspring. Accordingly, and pursuant to an order of the California Superior Court dated and filed May 11, 1976, various pieces of Sophia's property were distributed in accordance with her wishes as specified in various undated holographic bequests; family members then selected pieces from the remaining property, and all other property, including a car and various pieces of furniture and jewelry, was sold, and the proceeds divided so as to ensure that each of Sophia's three children and his or her issue received one-third of the total value of her property. At the time the personal property from Sophia's apartment was distributed, her total estate was in excess of $6,000,000. Sophia's will, dated January 17, 1969, provided for her personal property to be distributed to her children in equal shares, and for the rest of her estate to be placed in three equal trusts, one for each of her children and their *122 respective issue. The immediate cause of Sophia's death was bronchial pneumonia, which she contracted three days prior to her death. According to her death certificate, the bronchial pneumonia was a consequence of multiple cerebrovascular accidents and hypertension. William, however, testified that his mother had taken very little medication in her last three years, that she was a very healthy woman, and that at the time she entered the nursing home, he expected her to live for some time. Issue 2. Valuation of Pope & Talbot Shares
At the time of her death, Sophia owned 158,908 shares of Pope & Talbot Inc. common stock, approximately 5.15 percent of the 3,081,991 then outstanding shares. Sophia's shares were not registered, and she had no right to compel Pope & Talbot to file a registration statement for her shares. Pope & Talbot stock was traded on the New York Stock Exchange, and the mean between the highest and lowest quoted prices for shares sold on the Exchange on the date of Sophia's death was $17.1875 per share. The average weekly trading volume of Pope & Talbot shares for the four weeks immediately preceding Sophia's death was 3,600 shares per week. Pope & *123 Talbot was in the forest products industry. It was small compared to the leading companies in the industry, having a net worth of approximately $60,000,000 in 1976. Timberland constituted most of its assets, but in the late 1960's Pope & Talbot began to develop certain parts of its timber holdings for recreational use, and a small but significant portion of its assets in 1976 were derived from or related to this development. Sophia and seven blood relatives, including the chairman, president, and former president of Pope & Talbot, owned 42 percent of Pope & Talbot's stock. Several of Sophia's relatives by marriage served on Pope & Talbot's board of directors. In January 1971, Sophia received a letter from George A. Pope, Jr., then chairman of the board of Pope & Talbot, parts of which are set out in the margin, [2] advising her that in the opinion of counsel she and 20 other individuals were members of the control group of Pope & Talbot. *124 In 1972, several shareholders described by the January 1971 letter as members of the control group wished to sell a total of 220,000 shares of Pope & Talbot stock. Pope & Talbot filed a preliminary S-1 Registration Statement with the SEC on April 20, 1972, and several amendments thereto, with the intention of registering those shares so that they could be sold to the public in a secondary offering. [3] The proposed Registration Statement was withdrawn on December 8, 1972, without having become effective. During the first quarter of 1973, Pope & Talbot repurchased 127,811 of the aforementioned 220,000 shares for $2,411,000, or $18.86 per share. The reported book value of Pope & Talbot shares was then slightly below their market value, so that the repurchase slightly diluted the reported book value of outstanding Pope & Talbot shares. In early 1976, Pope & Talbot entered into negotiations with American Can Company concerning the acquisition of a half interest in American Can's Halsey, Oregon, *125 pulp and paper operations. Pope & Talbot then anticipated that this acquisition would require approximately $24,000,000. At the time of Sophia's death Pope & Talbot was engaged in very serious negotiations with American Can Company regarding the proposed acquisition. On March 28, 1977, Pope & Talbot publicly announced that it had entered into a letter of intent with American Can Company to acquire a half interest in the pulp mill and related facilities. On March 1, 1978, Pope & Talbot Pulp, Inc., a wholly owned subsidiary of Pope & Talbot, purchased from American Can Company a half interest in the pulp mill for $24,460,000. To finance this acquisition, Pope & Talbot borrowed $24,460,000 from the Bank of America; that loan, along with other loans, was refinanced later in 1978. In 1976, Pope & Talbot had a debt-equity ratio of 14 percent, well under its publicly announced target maximum ratio of 35 percent. Pope & Talbot's 1978 borrowing to finance the pulp mill acquisition raised its debt-equity ratio to over 45 percent.
OPINION Issue 1. Gifts in Contemplation of Death
Section 2035 [4] provides that the value of the gross estate of a decedent dying before January 1, 1977, shall *126 include the value of all gifts in contemplation of death made by the decedent within three years of his death. There is a rebuttable presumption that any gift made within three years of death was made in contemplation of death. Sec. 20.2035-1, Estate Tax Regs. We must decide whether the gifts in question arose from life motives or from the contemplation of death.To this end, we must determine the subjective state of Sophia's mind at the time the gifts were made. Estate of Johnson v. Commissioner,10 T.C. 680 (1948); Estate of Himmelstein v. Commissioner,73 T.C. 868 (1980). Sophia was an adjudicated incompetent when the gifts in issue were made but, under the doctrine of substituted judgment as applied in California, In re Guardianship of Christiansen,248 Cal. App. 2d 398, 56 Cal. Reptr. 505 (1st Dist. Ct. App. 1967); In re Wemyss,20 Cal. App. 3d 877, 98 Cal. Rptr. 85 (3d Dist. Ct. App. 1971), we may impute to Sophia the considerations which motivated her conservators *127 and the Superior Court of California to make the gifts in issue. Estate of Himmelstein v. Commissioner,supra; see also City Bank Farmers Trust Co. v. McGowan,323 U.S. 594 (1945). The following factors, inter alia, will be considered in determining whether or not the gifts in issue were made in contemplation of death: the age of the decedent at the time the transfers were made; the decedent's health at or before the time of the transfers; the amount of property transferred as compared to the amount of property retained; the existence of a general testamentary scheme of which the transfers were a part; the relationship of the donee or donees to the decedent, i.e., whether they were the natural objects of her bounty; the existence of a long established gift-making policy on the part of decedent; the existence of a desire on the part of the decedent to escape the burden of managing property by transferring the property to others; and the existence of a desire to avoid estate taxes by making inter vivos transfers of property. Estate of Johnson v. Commissioner,supra;Cunningham v. United States,553 F.2d 394 (5th Cir. 1977). *128 The following factors support respondent's position: Sophia's age (96) at the time of the transfers; the existence of a will in which Sophia directed that her personal property be distributed to her three children in equal shares; and Sophia's relationship to the recipients of the gifts--as her children and grandchildren, they were the natural objects of her bounty. The following factors support petitioner's position: the value ($66,000) of the property given to Sophia's children was very small compared to the total value (over $6,000,000) of her estate; Sophia had a long established policy of making gifts to her children; the property was very personal in nature and Sophia's conservators quite reasonably desired to escape the burden of storing it. Based on the entire record before us, it appears that neither Sophia's conservators nor the Superior Court of California were motivated by a desire to avoid estate taxes upon her estate. There was some evidence that Sophia was not in good health at the time of the gifts, but William, whom we found to be a credible witness, testified that when the gifts were made he believed his mother to be in good health, and liable to live for *129 a long time. On balance, giving particular weight to the small size of the gifts in issue relative to Sophia's total estate, Estate of Selling v. Commissioner,24 T.C. 191 (1955), we find that these gifts were not made in contemplation of death within the intendment of section 2035. [5]
Issue 2. Valuation of Pope & Talbot Shares
A decedent's gross estate includes the fair market value of all property owned by the decedent at the time of his death. Sec. 2031. Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither *130 being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Sec. 20.2031-1(b), Estate Tax Regs. For purposes of the estate tax, the fair market value of shares of a publicly-held corporation is ordinarily deemed to be the mean between the highest and lowest quoted selling prices on the valuation date, section 20.2031-2(b)(1), Estate Tax Regs., but, as will be demonstrated, the shares held by this decedent were substantially different from the shares being traded on the open market. If the executor of an estate can establish that the size of the block of stock to be valued is so large in relation to the actual sales on the existing market that it cannot be liquidated in a reasonable time without depressing the market, then "the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations." Sec. 20.2031-2(e), Estate Tax Regs. The value of restricted stock that may be sold only through a private offering to persons who take the stock subject to the same restriction is significantly lower than the value of unrestricted stock. Piper v. Commissioner,72 T.C. 1062, 1072 (1979); *131 Bolles v. Commissioner,69 T.C. 342, 354 (1977); Hirsch v. Commissioner,51 T.C. 121, 137 (1968); Husted v. Commissioner,47 T.C. 664, 678-679 (1967). The public sale of unregistered securities is prohibited by section 5 of the Securities Act of 1933, 15 U.S.C. sec. 77e, unless an exemption from the registration requirement is available. Section 4(1) of the Securities Act, 15 U.S.C. sec. 77d(1) exempts from the registration requirement of section 5 "transactions by any person other than an issuer, underwriter, or dealer." Section 2(11) defines "issuer" to include "any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer." Rule 144 of the Securities Act of 1933 provides a limited exemption from the registration requirement of section 5. Persons who have held restricted securities for two years may publicly sell such securities, except that the amount of securities sold, including all sales of securities of the same class by the seller within the preceding three months, may not exceed the greater of *132 one percent of the securities of the same class outstanding, or the average weekly reported volume of trading in such securities on all national securities exchanges. Section 4(2) of the Act exempts from the registration requirement of section 5 private offerings of securities. "Private offerings" are offerings to a limited number of sophisticated investors who have access to information material to the decision to invest in the offered securities. Securities purchased in a private offering remain restricted in the hands of the purchasers, and absent registration by the issuer may be sold only pursuant to Rule 144, or in another private offering. The parties disagree as to the value of Sophia's Pope & Talbot shares on the date of her death, petitioner contending for a value of $1,660,395, and respondent a value of $2,458,108. This Court has often noted that valuation disputes are particularly intractable to judicial determination, [6] and that settlement negotiations are much to be preferred to litigation in resolving such disputes.Resolution of valuation issues turns on a question of fact, the burden of proof of which is on petitioner. Rule 142(a), Tax Court Rules of Practice *133 and Procedure.
The present dispute centers on a question of securities law. Petitioner contends that the estate's Pope & Talbot shares were restricted securities and could have been sold only through Rule 144 sales, coupled with a private placement at a substantial discount; respondent takes the position that the shares were not restricted or, if they were restricted, that had Sophia's estate desired to sell the shares, Pope & Talbot would have filed a registration statement allowing the shares to be publicly sold, or itself repurchased the shares from the estate. Respondent does admit that the size of Sophia's block of stock relative to the average number of Pope & Talbot shares traded each week around the time of her death was so great that the shares could have been sold only at a 10 percent discount for blockage. Sec. 20.2031-2(c), Estate Tax Regs.
Petitioner produced the following evidence: the letter of January 1971, from the chairman of Pope & Talbot to Sophia; and the testimony of securities law expert Jesse Brill that the SEC probably *134 would not have issued a no-action letter if requested to do so by the estate in 1976. This tends to show that Sophia's estate was a "control" person in 1976, and that its Pope & Talbot shares were therefore restricted stock. At trial, respondent neither subjected Mr. Brill to any significant cross-examination, nor presented its own securities law expert. On brief, respondent relies principally on the argument that petitioner has not met its burden of proof under Rule 142(a) with respect to this question. On this record, we find that the estate was a control person in 1976. [7]
We must next determine whether Pope & Talbot, if so requested by the estate in 1976, would have filed a registration statement for petitioner's shares or repurchased those shares. It is this issue that the parties dispute most fiercely. If we find for respondent that Pope & Talbot would have done *135 either of these things, we need only determine a blockage discount in valuing the estate's shares; if we find for petitioner we must determine the fair market value of the shares if sold pursuant to Rule 144 and through a private placement. Petitioner relies on the testimony of George Folquet, chief financial officer and a director of Pope & Talbot in 1976. He testified that he would have recommended against filing a registration statement had Pope & Talbot been requested by the estate to do so in September 1976.Mr. Folquet listed several concerns that would have motivated his negative recommendation: in September 1976, Pope & Talbot was engaged in very serious negotiations with American Can Company, and filing a registration statement at that time would have required disclosure of those negotiations, something Pope & Talbot would not have wanted to do. Filing a registration statement would also have taken up time of Pope & Talbot's top management that might otherwise have been devoted to the American Can Company negotiations. Additionally, Mr. Folquet testified that he and Pope & Talbot's other officers had developed a negative attitude towards registration statements as a result *136 of the unsuccessful secondary offering of 1972, which had driven down the price of Pope & Talbot stock. [8]
Mr. Folquet also testified in support of petitioner's contention that Pope & Talbot would not have repurchased the estate's shares in 1976. Pope & Talbot's 1976 annual report discloses that $2,158,000 was to be paid in dividends to shareholders that year. The report also discusses various loan agreements, which contained "certain requirements as to the maintenance of working capital, sale of assets, incurrence of debt, and restrictions as to the payment of cash dividends. Under the most restrictive of these agreements, $2,802,000 was free of restrictions as to the payment of dividends." Unless Pope & Talbot's creditors could have been persuaded to relax their loan agreements, repurchase in 1976 of the estate's shares would have limited Pope & Talbot to approximately $600,000 in dividends, rather than the announced $2,200,000, a change that Mr. Folquet testified would not have been welcomed by the Pope & talbot board of directors, or by its stockholders. *137 Mr. Folquet also testified that at the time of Sophia's death Pope & Talbot was trying to accumulate cash for the upcoming transaction with American Can Company, and that this was an additional consideration that would have weighed against repurchasing the estate's shares in 1976. Respondent does not dispute Mr. Folquet's testimony, but argues that it should be discounted because Mr. Folquet failed to consider that the estate's shares may have been attractive to a "corporate raider," who would have purchased them in the hopes of eventually gaining control, or at least a position of influence, over Pope & Talbot. John Osterweis of E.F. Hutton & Co., one of respondent's experts, testified that the threat that a corporate raider might purchase the estate's shares would have led Pope & Talbot to file a registration statement so that the shares could be sold publicly rather than as a block, or to repurchase the shares. Anticipating the objection that Pope & Talbot did not have the ability to finance such a repurchase, Mr. Osterweis testified that in 1976 Pope & Talbot had an unusually low debt-equity ratio for its industry, and that its creditors would probably have waived their loan *138 restrictions. Mr. Osterweis also testified that Pope & Talbot's financial position was good enough that it would have been able to finance the repurchase of the estate's shares without significantly hampering its ability to finance its transaction with American Can Company. Mr. Osterweis's conjecture that the threat of a "corporate raid" would have caused Pope & Talbot to register, or purchase, the estate's shares in spite of the considerations weighing against such actions was admittedly based solely on his general knowledge of business practices, and not on any knowledge of Pope & Talbot's specific situation. Likewise, his assertion that Pope & Talbot's creditors would have waived their loan restrictions was not founded on any special knowledge of those creditors. We are therefore unable to give significant weight to Mr. Osterweis's conclusions. [9]
*139 Based on the facts and circumstances presented to us on this record, we believe that in valuing the estate's shares we should assume that the estate would have had to dispose of its shares by a combination of a Rule 144 sale and a private placement. The parties have stipulated that the estate could have sold 3,600 shares under Rule 144. Two of petitioner's experts, Richard Johnson of Dean Witter Reynolds, Inc., and Douglas Adkins of Kidder, Peabody & Co., prepared reports [10] and testified on the probable size of the discount that would have been required to sell the estate's shares through a Rule 144 sale and a private placement. They agreed that the estate could have sold 3,600 shares under Rule 144 only at a slight discount (Mr. Johnson, approximately 50 cents per share; Mr. Adkins, 3.6 percent under the day's trading price), because of the number of shares relative to the normal trading volume of Pope & Talbot stock. Respondent does not contest these assertions. Accordingly, we find that the shares salable pursuant to Rule 144 had a fair market value of $16.625 per share. *140 We must finally determine the size of the discount to be applied in valuing the remaining shares. According to Mr. Johnson's report: Because a purchaser of the shares [that would have been sold through a private placement] could only envisage being able to liquidate the shares after a two year holding period in small increments at six-month intervals pursuant to Rule 144, he would be facing a period of many years before he could expect to liquidate his holdings at prevailing market prices. As a result of this factor, together with the outlook for the forest products industry in general, Pope & Talbot in particular, general securities market conditions, economic factors, interest rates, the dividend yield and historical price movement of Pope & Talbot stock, it is our firm's opinion that a purchaser of the remaining shares could be found at a price approximately 1/3 below the prevailing market price, i.e. $11.42. At trial, Mr. Johnson testified that the discount stated in his report was very conservative, and that it may have been difficult for the estate to find a buyer at any price. The Kidder-Peabody report valued the shares in issue at $10.75 per share, a discount *141 of 37.2 percent from the closing price on September 28, 1976. Respondent mounts a two-pronged attack on the valuation offered by petitioner's experts. Mr. Osterweis testified that the reported book value of Pope & Talbot's assets in 1976, $19.59 per share, was much lower than their real value, which he calculated at between $61.87 and $86.47 per share. He suggested that since Pope & Talbot was a small company by New York Stock Exchange standards, and was not as closely followed by analysts as larger companies, Pope & Talbot's stock may have been significantly undervalued by the market. Based on this testimony, respondent contends that Pope & Talbot's stock was undervalued, and that this undervaluation would have led to a reduction in the private placement discount. On cross-examination, respondent inquired of Mr. Johnson whether he had considered in his valuation the large difference between the reported book value and the real value of Pope & Talbot's assets. Mr. Johnson replied: The holdings of the company were no secret. That information was already available to the buying public. Therefore, unless you have information to the contrary, it is a fair presumption that the *142 stock is fairly valued and that those assets are fairly valued by minority holders of that security. On this record we are not prepared to find that Pope & Talbot stock was not correctly valued by the market in 1976. On brief, respondent argues that in calculating the private placement discount, neither of petitioner's valuation experts considered the possibility that the estate's shares might interest a "corporate raider." As discussed above, respondent's expert Mr. Osterweis testified that the estate's Pope & Talbot shares might have attracted the interest of a "corporate raider" hoping to gain a large or controlling interest in Pope & Talbot. We rejected as too speculative Mr. Osterweis's suggestion that the possibility of the estate's shares falling into the hands of a "corporate raider" would have induced Pope & Talbot to purchase the estate's shares or file a registration statement so that they could have been sold in a public offering. On this record, we likewise reject as too speculative the argument that "corporate raiders" would have bid the price of the estate's shares above the discount that would otherwise have obtained had those shares been sold in a private placement.
*143 From all of the above and from the entire record, we find and hold that the stock that would have been ineligible for sale under Rule 144 had a value of $11.42 per share. Compare Bolles v. Commissioner,supra at 354-355. Decision will be entered under Rule 155.
Footnotes
1. Four of her grandchildren received $3,000 a year; the other four received $1,500 a year.↩
2. Recently a substantial stockholder of Pope & Talbot, Inc. sold several thousand shares of Common Stock to an institutional buyer. This transaction brought into focus a problem which affects all of the so-called family member stockholders of Pope & Talbot, Inc. Under the Securities Act of 1933 there are certain restrictions placed upon the right of those persons who are deemed "controlling stockholders" to sell or otherwise dispose of their shares. Shares held by "controlling stockholders" must be sold either (a) in a private placement (which because of limitations on resale usually results in a discount on the selling price) or (b) within those certain limitations promulgated by the Rules of the Securities and Exchange Commission. In the opinion of Brobeck, Phleger & Harrison, general counsel for Pope & Talbot, Inc., you are a member of a single controlling group. * * * Under present rules (Rule 154 of the Securities and Exchange Commission) all of the members of a single controlling group, as an aggregate, may not sell more than 1% of the Company's Common Stock during any six-month period. * * *↩
3. A public offering of shares owned by control persons is called a secondary offering because the stock offered for sale has previously been sold to the control persons by the issuer.↩
4. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise stated.↩
5. We note that extreme old age of the donor, the existence of a will of the donor consistent with his gifts, and the existence of a close relationship between the donor and donees have been found insufficient, in the face of contrary evidence, to support a finding that a gift was in contemplation of death. Estate of Johnson v. Commissioner,10 T.C. 680 (1948); cf. Murphy v. United States, 64-2 USTC par. 12,244, 15 AFTR 2d 1400 (W.D. Mo. 1964); C. B. Kniskern, Jr., Exr. v. United States,232 F. Supp. 7↩ (S.D. Fla. 1964).
6. "[C]apable of resolution only by a Solomon-like pronouncement." Messing v. Commissioner,48 T.C. 502, 512↩ (1967).
7. We make no finding that the SEC would have refused to rule that the estate was not a control person if so requested in 1976, or that a court would have found the estate to be a control person. We merely find that petitioner has met its burden of proof and that respondent has presented no rebuttal.↩
8. "[W]hen we filed, and got ready to sell the stock, the stock took a very -- in our opinion -- severe drop."↩
9. Even if we were willing to give significant weight to Mr. Osterweis's conjectures, we note that the premise upon which they rest, that Pope & Talbot would have been attractive to a "corporate raider," is open to question. On cross-examination, Mr. Osterweis stated that he had not seen the spread sheet detailing the percentage of Pope & Talbot's stock that was closely held, and then admitted that "[v]ery clearly, anybody contemplating a * * * ["corporate raid"] takes into account the concentration of ownership, and whether that concentration is satisfied or dissatisfied ownership."↩
10. Although Douglas Adkins testified at trial, Robert Smelick, formerly of Kidder, Peabody & Co., prepared the Kidder, Peabody report.↩