**POPE & TALBOT, INC., and Subsidiaries, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 97–71359.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 4, 1998.

Decided Jan. 6, 1999.

James E. Burns, Jr., Brobeck, Phleger & Harrison, San Francisco, CA, for petitioner-appellant.

Thomas J. Clark, Tax Division, United States Department of Justice, Washington, DC, for respondent-appellee.

Before: NOONAN, THOMPSON and TROTT, Circuit Judges.

Opinion by Judge THOMPSON; Dissent by Judge NOONAN.

DAVID R. THOMPSON, Circuit Judge:

The taxpayer Pope & Talbot, Inc. ("Pope & Talbot") appeals the tax court's decision under 26 U.S.C. § 311(d)(1) determining the gain Pope & Talbot was required to recognize when it distributed appreciated property to a limited partnership, which in turn distributed limited partnership interests to the Pope & Talbot shareholders. The tax court calculated the fair market value of the distributed property by determining what a willing buyer would have paid a willing seller in a hypothetical sale of the property on the date of distribution.

Pope & Talbot contends the tax court should have determined the fair market value of the distributed property by aggregating the market value of the limited partnership interests the shareholders received. We have jurisdiction under 26 U.S.C. § 7482, and we affirm.

## I

## BACKGROUND

Pope & Talbot is a publicly held Delaware corporation. Its shares are traded on the New York Stock Exchange. During 1985, Pope & Talbot's Board of Directors and shareholders approved a "Plan of Distribution" ("the Plan") to transfer 71,363 acres of its timberlands, timber, land development, and resort businesses in the State of Washington (together, "the Washington Properties") to Pope Resources, a newly formed Delaware limited partnership ("the Partnership"). Although Pope & Talbot was not to become a partner in the Partnership, the Plan included the formation of two new Delaware corporations-Pope MGP, Inc. and Pope EGP, Inc.-to serve, respectively, as the managing general partner and the standby general partner. Both of these new corporations were owned initially by two principal shareholders of Pope & Talbot, who were to have exclusive authority for managing the Partnership. The Plan required that when Pope & Talbot transferred the Washington Properties to the Partnership, the Partnership would issue limited partnership interests to Pope MGP, Inc., which in turn would distribute the limited partnership units pro rata to the Pope & Talbot shareholders. The holders of the limited partnership units were to have no management power and only limited voting rights.

The effective date of the distribution was December 20, 1985. On that date Pope & Talbot borrowed $22.5 million from Travelers Insurance Company, secured by the Washington Properties, and then transferred the Washington Properties to the Partnership subject to this liability. Pope & Talbot retained the $22.5 million in loan proceeds. Pope & Talbot also transferred $1.5 million in cash and certain installment notes receivable to the Partnership. The Partnership paid Pope & Talbot $5 million for the installment notes receivable, making this payment with funds it borrowed from an unrelated lender.

The Partnership paid no consideration for the Washington Properties. The limited partnership units in the Partnership were distributed to the approximately 6,000 shareholders of Pope & Talbot, each shareholder receiving one limited partnership unit for every five shares of Pope & Talbot's common stock.

Two weeks before the effective date of the distribution, approximately 1.2 million limited partnership units of the Partnership began trading on the Pacific Stock Exchange on a "when issued" basis. A "when issued" transaction is a conditional transaction in which the buyer indicates a desire to buy the security when it is authorized for sale. The weighted average trading price of the partnership units between December 6, 1985, and

January 7, 1996, was approximately $11.50 per unit.

When Pope & Talbot filed its tax returns, it computed the fair market value of the distributed property by using the aggregate value of all the limited partnership units, which individually were valued at $11.50 per unit. The Commissioner disputed this valuation and determined that additional tax was due. Pope & Talbot eventually filed suit in the tax court challenging the Commissioner's deficiency determination.

The tax court granted the Commissioner's motion for partial summary judgment, holding that, under 26 U.S.C. § 311(d)(1),[1] the appropriate methodology to compute Pope & Talbot's gain on the distribution of the appreciated Washington Properties was to treat the properties as if they had been sold by Pope & Talbot for their fair market value on the day of distribution and "not by reference to the property interest received by each shareholder."

A trial then ensued to determine the fair market value of the Washington Properties, using the methodology determined by the tax court in its partial summary judgment. The tax court reviewed extensive expert witness reports and testimony about the fair market value of each of the Washington Properties. Based on this review, the court determined that the valuation range for the combined Properties was between $46.7 million and $59.7 million. The court then considered the aggregate value of the trading price of the limited partnership units, but only as evidence of the fair market value of the Properties. Concluding that the aggregate value of the units warranted valuation toward the low end of the valuation range, the court found the fair market value of the Washington Properties to be $48.5 million.

In this appeal, Pope & Talbot challenges the methodology by which the tax court valued the distribution of the Washington Properties, as well as the value placed on those properties.

---

1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect

## II

### ANALYSIS

To determine the correct methodology to be used in calculating the fair market value of appreciated property a corporation distributes to its shareholders, we must interpret 26 U.S.C. § 311(d)(1).

The version of 26 U.S.C. § 311(d)(1) ("section 311(d)(1)") in effect when this distribution occurred provides:

I. Distributions of Appreciated Property.—

(1) In General.—If—

(A) a corporation distributes property (other than an obligation of such corporation) to a shareholder in a distribution to which subpart A applies, and

(B) the fair market value of such property exceeds its adjusted basis (in the hands of the distributing corporation),

then a gain shall be recognized to the distributing corporation in an amount equal to such excess as if the property distributed had been sold at the time of distribution.

26 U.S.C. § 311(d)(1) (1984).

■ Our analysis begins with the language of the statute. When "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" *Giovanini v. United States,* 9 F.3d 783, 785 (9th Cir.1993) (quoting *United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)).

The statute's focus is on gain to the corporation. The final clause of the statute provides that a distributing corporation is required to recognize such gain "in an amount equal to [the excess of fair market value over adjusted basis] as if the property distributed had been sold at the time of distribution." 26 U.S.C. § 311(d)(1)(1984). This clause unambiguously requires that the distributed property be valued as if the corporation had sold it. The plain reference is to the corporation's property. This is made even plainer by subsection 311(d)(1)(A), which specifically

for the taxable years in issue (1985 and 1986).

refers to property distributed by the corporation, and subparagraph (B), which refers to "the fair market value of *such property.*" Finally, the parenthetical clause of subparagraph (B) refers to the property and its adjusted basis "(*in the hands of the distributing corporation*)."

■ We conclude that the plain meaning of section 311(d)(1) requires that the gain recognized by Pope & Talbot be valued as if the corporation had sold the Washington Properties at the time of distribution, not by aggregating the value of the individual limited partnership units.

The legislative history supports this conclusion. Since 1969 Congress has passed several income tax measures that have progressively repealed the controversial holding of the Supreme Court in *General Utilities & Operating Co. v. Helvering,* 296 U.S. 200, 56 S.Ct. 185, 80 L.Ed. 154 (1935). The *General Utilities* case gave corporations a loophole through which they could avoid the traditional two-tier taxation of corporate income. *See generally* Boris I. Bittker & James S. Eustice, *Federal Income Tax of Corporations and Shareholders* ¶ 8.20 (6th Ed.1998). In *General Utilities,* the Supreme Court held that a corporation was not required to recognize gain when it distributed appreciated property to its shareholders. *General Utilities,* 296 U.S. at 206, 56 S.Ct. 185.

Congress began its repeal of the *General Utilities* holding with the Tax Reform Act of 1969, Pub.L. No. 91–172, § 905(a), 83 Stat. 487 (1969). That Act provided that a corporation distributing property to a shareholder *in a redemption* must recognize gain to the extent the fair market value of the property distributed exceeds the corporation's adjusted basis in the property. 26 U.S.C. § 311(d)(1) (1969). The legislative history of the Act includes the following:

> *General reasons for change.*—Recently, large corporations have redeemed very substantial amounts of their own stock with appreciated property and in this manner have disposed of appreciated property for a corporate purpose to much the same effect as if the property had been sold and the stock had been redeemed with the proceeds of the sale. The appreciation is not taxed [sic] however, on this type of disposition.
>
> . . . .
>
> The committee does not believe that a corporation should be permitted to avoid tax on any appreciated property (investments, inventory, or business property) by disposing of the property in this manner.
>
> *Explanation of provisions.*—The committee amendments provide that if a corporation distributes property to a shareholder in redemption of part or all of his stock and the property has appreciated in value in the hands of the distributing corporation (i.e. [sic] the fair market value of the property exceeds its adjusted basis), then gain is to be recognized to the distributing corporation to the extent of the appreciation. . . .

S.Rep. No. 91–552, at 279 (1969), 1969–3 C.B. 423, 600; H.R. Conf. Rep. No. 91–782, at 333 (1969), 1969–3 C.B. 644, 677.

Pope & Talbot argues that the "evident purpose" emerging from this legislative history was Congress's intent to "equalize" the tax treatment between a pre-distribution sale by the corporation and a post-distribution sale by the shareholder. We disagree.

The legislative history of the 1969 Act points to Congress's concern about a corporation avoiding taxable gain when it distributes appreciated property to its shareholders in redemption of the corporation's stock. The legislative history says nothing about what gain shareholders might have to recognize. The focus is entirely on the value of the distributed property in the hands of the corporation, not on its value once the distribution to the shareholders is completed.

Congress continued its repeal of the *General Utilities* doctrine with the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 54, 98 Stat. 568 (1984). This Act amended section 311(d)(1) by providing that gain would be recognized if a corporation distributes property to a shareholder in a "distribution to which subpart A applies," not just in dis-

tributions involving redemptions.[2] The legislative history of the 1984 amendment again points to Congress's purpose:

### Reasons for Change

In many situations, present law permits a corporation to distribute appreciated property to its shareholders without recognizing the gain. In such a case, if the distributee is an individual, the basis of the property will be stepped up without any corporate-level tax having been paid (although the individual shareholder will often have dividend income in an amount equal to the fair market value of the property). The committee believes that under a double-tax system, the distributing corporation generally should be taxed on any appreciation in value of any property distributed in a non-liquidating distribution. *For example, had the corporation sold the property and distributed the proceeds, it would have been taxed. The result should not be different if the corporation distributes the property to its shareholders and the shareholders then sell it. . . .*

### Explanation of Provisions

*Under the bill, gain (but not loss) is generally recognized to the distributing corporation on any ordinary, non-liquidating distribution, whether or not it qualifies as a dividend, of property to which subpart A (secs. 301 through 307) applies as if such property had been sold by the distributing corporation for its fair market value rather than distributed.* The general rule applies whether or not there is a redemption of stock.

S.Rep. No. 98–169 (Vol.1), at 176–77 (1984) (emphasis added); H.R.Rep. No. 98–432 (Part 2), at 1189–90 (1984).

Regardless of the legislative history, Pope & Talbot argues that section 311(d)(1) must be read symmetrically with 26 U.S.C sections 301 and 302.[3] Such a reading, Pope & Talbot contends, yields the conclusion that the "fair market value" of the property distributed by a corporation necessarily equals the "fair market value" of the property in the form it is received by the shareholders. We disagree with this reading of these sections.

Sections 301 and 302 focus on shareholders' tax liability. Cases interpreting these sections usually concern to what extent shareholders receiving distributions should be taxed. *See, e.g., Cordner v. United States,* 671 F.2d 367 (9th Cir.1982) (holding that gold coins distributed to shareholders were "property" to be taxed at fair market value for purposes of section 301). However, if the corporation distributes one form of property and the shareholders receive another, there is no "symmetry." That was the case here. The corporation did not distribute gold coins to shareholders who received gold coins. The corporation distributed the Washington Properties to the Partnership, and the shareholders received individual limited partnership interests. We conclude the tax court used the proper methodology to determine the fair market value of the distributed property.

We next consider the tax court's actual valuation of the Washington Properties. Pope & Talbot argues that even if the value is to be determined by reference to the value of the distributed property in the hands of the corporation, the tax court erred in not

---

**2.** Subpart A, which encompasses 26 U.S.C. sections 301 through 307, sets forth the effects of corporate distributions on recipients. Section 301 concerns the distributions of property; section 302 concerns distributions in redemption of stock; section 303 concerns distributions in redemption of stock to pay death taxes; section 304 concerns redemption through use of related corporations; section 305 concerns distributions of stock and stock rights; section 306 concerns dispositions of certain stock; and section 307 concerns the basis of stock and stock rights acquired in distributions. 26 U.S.C. §§ 301–307.

**3.** Section 301 sets forth how a shareholder receiving a distribution of property should be taxed, specifically requiring that the "amount of any distribution shall be the amount of money received, plus the fair market value of the other property received." Under section 302, a redemption transaction is treated either as an exchange whereby section 1001 applies or as a distribution of property whereby section 301 applies. If it is treated as an exchange, section 1001 requires that the amount realized be the sum of any money received plus the "fair market value of the property received." 26 U.S.C. §§ 301 and 302 (1984).

finding that value to be the aggregate dollar amount of the limited partnership units on the date of distribution. That value, Pope & Talbot argues, is the true value placed on the Washington Properties by the market in actual sales of partnership units, not on some hypothetical sale conjured up for valuation purposes.

To support its argument, Pope & Talbot asks us to embrace the "Efficient Market Hypothesis." This hypothesis theorizes that, in an efficient capital market, the trading prices of securities constitute unbiased estimates of the value of the underlying assets. Using this method of valuation, the Partnership's assets would have an aggregate fair market value of approximately $41.5 million. This sum is obtained by adding the aggregate public trading price of the partnership units on the distribution date (1.2 million units × $11.50 per unit, or $13.8 million) to the initial indebtedness of the Partnership ($27.7 million).

█ The success of Pope & Talbot's argument depends on applying to this case the general rule that, when one is valuing securities on a stock exchange, "the average exchange price quoted on the valuation date furnishes the most accurate, as well as the most readily ascertainable, measure of fair market value." *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 83 (3d Cir.1975) (holding the tax court erred in using the "barter-equation method" to fix fair market value of stock) (citations omitted). We are unpersuaded that this general rule applies to the Pope & Talbot distribution before us.

The rule in *Amerada Hess* applies to the valuation of stocks, not to the valuation of the underlying assets of a publicly traded entity. Furthermore, *Amerada Hess* qualifies the general rule relating to the valuation of stocks by noting that the "assumption underlying the concept of the market as an index

for valuing particular property is that the property to be valued is substantially similar to the property actually sold on the market." *Id.* This hypothesis would not hold true, however, when, for example, stock is subject to restrictions on alienation or voting rights. *See id.* at 84. Moreover, the trading prices of securities in a free and active market often reflect the value of minority interests. *Estate of Jung v. Commissioner*, 101 T.C. 412, 434, 1993 WL 460544 (1993).[4] We, therefore, reject a general principle that the market price of securities accurately reflects the value of underlying assets. Courts must choose valuation methods that best suit the circumstances.

For example, in *Philip Morris, Inc. and Consolidated Subsidiaries v. Commissioner*, the tax court had to determine the value of intangible assets of the Seven–Up Company, from which Philip Morris had acquired stock. Because a control premium had been paid for voting control, the court used an "excess earnings" approach, which yielded a value different from the aggregate trading value of the stock. *Philip Morris, Inc. and Consol. Subs v. Commissioner*, 96 T.C. 606, 628–32, 1991 WL 51559 (1991), *aff'd without published opinion*, 970 F.2d 897 (2d Cir.1992).

Common sense also dictates that the value of an entire interest in property, such as the Washington Properties, is greater than the sum of its fractional parts. Case law is not to the contrary. Given that fractional interests are restricted in their control of the overall property, "courts have consistently recognized that the sum of all fractional interests in a property is less than the whole and have upheld the use of fractional interest discounts in valuing undivided interests." *Estate of Bonner v. United States*, 84 F.3d 196, 197 (5th Cir.1996) (citations omitted).

These principles apply to the present case. The Pope & Talbot shareholders who re-

---

4. Pope & Talbot contends that *Estate of Jung* is inapposite because it involved a closely held corporation. This distinction is not significant because *Estate of Jung* also discussed stocks traded in the public market. Citing a commentator, the court in *Jung* discussed the applicability of minority discounts generically, not just as applied to close corporations. Unlike market discounts, which apply only to close corporations, minority

discounts arise in many valuation situations where blocks of stock represent minority ownerships. "Minority blocks of stock, by themselves, generally do not have the power ... to effect any significant corporate change ..." *Id.* (citing Zukin & Mavredakis, *Financial Valuation: Businesses and Business Interests* ¶ 6.9[2], at 6–39 (1990)).

ceived limited partnership units in the Partnership received fractional parts of the whole. These fractional parts also bore some burdens. As the tax court found, the limited partners had no management powers, limited voting rights, and significant limitations on their power to remove the managing general partner.

In addition, the limited partnership interests were newly issued. This circumstance made the units difficult to value. According to a report prepared by Kidder, Peabody & Co. prior to the distribution, once the limited partnership units were placed on the market, the units would be "very undervalued relative to the market value of the Partnership's underlying assets" because of "low cash distribution," "the complexity of tax issues," "uncertainty over future tax law changes," and "small market capitalization of the units." Kidder, Peabody believed that a trading value of $5 to $7 per unit was possible, but estimated that "the underlying asset value could be around $26 a unit."

Finally, in Pope & Talbot's proxy statement to its shareholders, Pope & Talbot stated that the corporation was transferring the Washington Properties to the Partnership because it believed that the market value of the properties was not fully reflected in the trading price of Pope & Talbot's stock. Although we understand that this statement describes the market value of the Washington Properties while they were being overshadowed by Pope & Talbot's other assets, such a motive in transferring the assets nevertheless undercuts Pope & Talbot's "Efficient Market Hypothesis" argument.

Because market valuation based on sales of the individual limited partnership units would not accurately value the Washington Properties, the tax court properly turned to expert appraisals. The court heard extensive valuation testimony, finally determining a valuation range for the Washington Properties of between $46.7 million and $59.7 million. It also considered the aggregate trading price of the partnership units and ultimately found the fair market value of the Washington Properties on the date of distribution to be $48.5 million. The tax court did not err in making this finding.

## III

## CONCLUSION

We affirm the tax court's decision that the gain on the distribution of appreciated property under 26 U.S.C. § 311(d)(1) is to be determined as if the distributed property had been sold by the corporation at the time of distribution. We also affirm the tax court's valuation of the distributed property.

AFFIRMED.

NOONAN, Circuit Judge, dissenting:

The statute has the clarity and cleanliness of a theorem of Euclid. It becomes obtuse and muddy only when it is subjected to the stroking of the Commissioner and the tax court in their novel, unprecedented application of it to Pope & Talbot. In terms of the statute three questions must be answered in this case. What is "the property" to which the statute applies? How is "fair market value" to be determined? What is the force of the hypothetical "as if the property distributed had been sold"? The property to which the statute refers is the property distributed to each stockholder. The fair market value is to be determined here, as generally under the Internal Revenue Code, by the relevant market. The hypothetical authorized by the statute is a hypothetical sale, not a hypothetical market and not a hypothetical value.

Although the statute in some form has been on the books for nearly 30 years the Commissioner, no doubt confident of its clarity, has promulgated no regulation elucidating the statutory text. The Commissioner did issue a ruling stating that the statute "does not hypothesize a sale to an unrelated party." Revenue Ruling 75–514, 1975–2 C.B. The statute, in other words, hypothesizes a sale to a shareholder or shareholders of the corporation. The statute has been amended since 1975 in ways that do not detract from the force of this focus on the hypothetical sale as one made to the owners of the corporation. The Revenue Ruling gives a clue as to how the statute should be understood here. For purposes of the statute, "the property dis-

tributed" to the owners and the property hypothetically sold to the owners are the same. The property is what each owner receives. The Commissioner and the tax court add two words to the statute when they maintain that it is "the entire property" that should be valued as if the entire property was sold to each owner. Rather, it is whatever property that is distributed to each stockholder which is to be valued as if sold by the company at the time of distribution.

How is the fair market value of this property to be determined? No specific regulation answers the question, but the Commissioner has provided an answer that is universally valid unless there is good specific reason for rejecting it: "As a generalization, the prices of stocks which are traded in volume in a free and active market by informed persons best reflect the consensus of the investing public as to what the future holds for the corporations and industries represented." Revenue Ruling 59–60, 59–1 C.B. 737. The tax court has followed this sage conclusion by refusing to let the Commissioner tax an estate on an appraiser's high valuation of the assets of Pope & Talbot itself, holding rather that the proper valuation is that put on the company stock by the stock market. *Estate of Brownell v. Commissioner*, 44 T.C.M. 1550 (1982). The same principle was applied by the tax court in *Philip Morris v. Commissioner*, 96 T.C. 606, 1991 WL 51559 (1991).

The fair market value in this case, as in *Brownell*, was established by the market in the partnership units traded on the Pacific Stock Exchange. That value was confirmed by the market's valuation of the stock of Pope & Talbot following the distribution, reflecting that in no way the market regarded the distribution as a distribution of over $55 million of the assets of Pope & Talbot.

Against these judgments of the market made at the time of distribution the Commissioner and the tax court have opposed the estimates of experts made a decade after the event. The statute authorizes the Commissioner to use a hypothetical sale. The statute does not authorize the Commissioner to substitute a hypothetical value for a value readily ascertainable from actual trading in a

free and informed market. The position of the Commission and the tax court rests on an equivocation, viz. that appreciation had occurred at the time of distribution. But no appreciation was recognized by the only relevant market before or after distribution. The Commissioner seeks to tax a purely hypothetical appreciation; he is not entitled to do so. If the market later does recognize appreciation because of the underlying value of the assets, that appreciation does not escape tax; it will be taxed to each partner as the partner sells a share. The partner will not have a stepped-up basis. All the appreciation that is market-recognized will be captured by the Commission.

The fallback position of the tax court is that the legislative history of the statute shows a congressional intent to subject the corporation to tax on any appreciation of any assets it distributes. But the rationale of the report relied upon by the tax court stresses that the distributees in the situation envisaged by the statute will have a stepped-up basis on the property received. Staff of Joint Comm. on Taxation. General Explanation of the Revenue Provisions of the Debt Reduction Act of 1984, at 149–150 (J. Comm. Print 1985). Here the distributees are concededly taxed on the basis of property valued at $11.40 per unit; there has been no stepped-up basis reflecting appreciation in assets from Pope & Talbot.

The Commissioner and the tax court's decision leads to the anomaly that the fair market value of the property distributed is one thing when received by the shareholders, another thing when distributed by the corporation. No good reason is given why the statute should tax the same property at the same time at two different values.

It is suggested that timberland undivided in the hands of Pope & Talbot is worth a lot more than a sliver of the property held as a limited partnership unit. The answer is deficient in several ways. The answer begs the question as to what the property distributed is under the statute. The answer ignores the market's evaluation of Pope & Talbot stock before and after the distribution. The answer counter-factually assumes that Pope & Talbot did their shareholders a substantial

disservice by reducing the value of assets to which the shareholders were entitled. The answer exaggerates the difference between a Pope & Talbot shareholder, pre-distribution, and a limited partner, post-distribution. In fact, in neither case could a minority shareholder or a limited partner control the assets of the company or realize the value of the timber; in both cases a slow cash flow could be expected to be their lot.

The great difficulty with the Commissioner and tax court's position, which carries the implications of this case far beyond the immediate facts, are two teachings: (1) that the valuation of publicly traded property in a free and open market is not as good as the hypothesis of an expert ten years after the fact; and (2) that fair market value is not to be determined in the same way under Sections 301–11 of the Code and not to be determined in the same way for the same property at the same time but to be determined ad hoc to achieve the tax the Commissioner contends Congress must have had in mind.