118 T.C. No. 5


UNITED STATES TAX COURT


SOUTH TULSA PATHOLOGY LABORATORY, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18557-98.              Filed January 28, 2002.


      P agreed to sell a portion of its business
(clinical business) to N, a third party, pursuant to a
prearranged sale that was structured as a spinoff.  P's
basis in the clinical business's assets was $105,015.
On Oct. 29, 1993, P transferred the clinical business
to a newly incorporated entity, S, in exchange for all
of S's stock, pursuant to sec. 368(a)(1)(D), I.R.C.,
and, on Oct. 30, 1993, P distributed the stock to P's
shareholders in a transaction it claimed satisfied the
requirements of sec. 355, I.R.C.  On the same day as
the distribution of S's stock to P's shareholders, S's
shareholders sold all of S's stock to N for $5,530,000.
P had accumulated E & P as of the beginning of its
taxable year and failed to prove that P and S did not
have current E & P as of Oct. 30, 1993.  Although P
conceded that the spinoff followed immediately by the
prearranged stock sale constituted evidence that the
transaction was a device to distribute E & P within the
meaning of sec. 355(a)(1)(B), I.R.C., and sec. 1.355-

2(d), Income Tax Regs., P claimed it had valid corporate business purposes for structuring the transaction as it did which overcame the evidence of device. Alternatively, P argued that, even if the spinoff did not meet the requirements of secs. 355 and 368, I.R.C., the value of S's stock for purposes of calculating the gain P must recognize under sec. 311(b)(1), I.R.C., should be calculated based on the value of the assets transferred to S and not on the price paid for S's stock by N.

1. Held: There is substantial evidence that the spinoff was a device to distribute E & P, which is not overcome by substantial evidence of nondevice or by evidence that P and S lacked current and accumulated E & P. Consequently, the spinoff does not qualify for tax deferral under secs. 368 and 355, I.R.C., and P's gain must be determined in accordance with sec. 311(b)(1), I.R.C.

2. Held, further, sec. 311(b)(1), I.R.C., requires P to recognize gain on the distribution of S's stock as though the stock were sold to P's shareholders at its fair market value. In this case, the best evidence of the fair market value of S's stock on the distribution date is the price paid for the stock by N on that same date.

Thomas G. Potts, for petitioner.

Elizabeth Downs, for respondent.

MARVEL, Judge: Respondent determined a deficiency in petitioner's Federal income tax of $1,926,232 for taxable year ended June 30, 1994.

The issues for decision are: (1) Whether, pursuant to a plan of reorganization under section 368(a)(1)(D),[1] petitioner's

---

[1]All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the
(continued...)

distribution to its shareholders of stock of a controlled corporation qualified as a nontaxable distribution under section 355; and (2) if the distribution did not qualify as a nontaxable distribution under section 355, whether the fair market value of the distributed stock for purposes of calculating petitioner's gain under section 311(b)(1) is measured by the price paid for the stock by a third-party purchaser on the distribution date or by the alleged value of the controlled corporation's assets on the day before the distribution.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts herein by this reference.

### I. Petitioner's Business in General

South Tulsa Pathology Laboratory, Inc. (petitioner), is, and was for all relevant periods, an Oklahoma professional corporation, which had its principal place of business in Tulsa, Oklahoma, when it filed its petition in this case. Petitioner was incorporated as an Oklahoma professional corporation in July 1968. Petitioner was owned by seven physicians (shareholders). For all relevant periods, petitioner was classified as a "C" corporation for Federal corporate income tax purposes and had a

---

[1](...continued)
Tax Court Rules of Practice and Procedure. Monetary amounts are rounded to the nearest dollar.

fiscal year ended June 30 for tax and financial reporting purposes.

Since its incorporation, petitioner has provided pathology-related medical services to hospitals and medical professionals in northeastern Oklahoma. Until 1993, petitioner offered both anatomic pathology and clinical pathology medical services to its customers (anatomic business and clinical business, respectively). Petitioner's anatomic business included examination and diagnosis of pathology of human tissue and provision of consulting diagnostic assistance to physicians in northeastern Oklahoma. Petitioner's anatomic business services were performed by its physician shareholders and/or other licensed physicians. Petitioner's clinical business included performance of laboratory tests on body fluids and tissue samples obtained from hospitals and medical professionals throughout northeastern Oklahoma. Petitioner's clinical business services were performed by nonphysician employees of petitioner at a laboratory and three "draw" facilities in Tulsa, Oklahoma.

II. Petitioner's Decision To Sell Its Clinical Business

Beginning in 1970, and continuing through 1992, petitioner received several offers from competing clinical pathology laboratories to purchase its clinical business. These offers were always rejected by petitioner's shareholders and management. In 1993, however, petitioner's shareholders decided to sell the

clinical business to a large national clinical laboratory because they believed the growth of large national clinical laboratories and the implementation of managed health care during the early 1990s would force petitioner out of the clinical business over the next few years. Petitioner's shareholders, however, decided they wanted to continue to own and operate the anatomic business using the corporate name, "South Tulsa Pathology Laboratory, Inc.", under which they had practiced for 25 years.

III. Sale of Clinical Business to NHL

In August 1993, petitioner was approached by representatives of two national laboratory chains, Smith Kline Laboratories (Smith Kline) and National Health Laboratories, Inc. (NHL), each of which expressed an interest in purchasing petitioner's clinical business. Both Smith Kline and NHL were large, publicly traded corporations that provided clinical laboratory services to hospitals, physicians, and clinics throughout the United States.

Sometime in the fall of 1993, petitioner decided to pursue a sale of its clinical business to NHL. On September 20, 1993, petitioner and NHL entered into a confidentiality agreement to provide for the disclosure by petitioner to NHL of certain confidential information. Under the confidentiality agreement, petitioner agreed to disclose certain financial and business information necessary and appropriate in any negotiations conducted by the parties.

After petitioner made the disclosures pursuant to the confidentiality agreement, petitioner agreed to sell its clinical business to NHL. Before October 5, 1993, petitioner and NHL negotiated the sale of the clinical business and agreed to structure it as a sale of the stock of a yet-to-be-incorporated clinical laboratory company that would be capitalized with the clinical business and spun off[2] from petitioner. Thereafter, NHL delivered to petitioner a letter of intent, dated September 30, 1993, concerning the purchase by NHL of all outstanding stock of that newly incorporated clinical laboratory company. After both parties signed the letter of intent, petitioner's shareholders believed there was a commitment by NHL to buy and a commitment by petitioner to sell petitioner's clinical business.[3] As of October 5, 1993, petitioner and NHL had negotiated and agreed to the essential terms of the sale.[4]

---

[2]A spinoff is described as a "pro rata distribution by one corporation of the stock of a subsidiary". Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 11.01[1][e], p. 11-6 (7th ed.).

[3]Ordinarily, NHL purchased clinical laboratory businesses through an asset sale. In this case, NHL agreed to structure its purchase of the clinical business as a stock sale only if it could acquire a "clean" corporation. A "clean corporation" was defined by the parties as one in which no clinical laboratory tests had been performed that could subject the purchaser (NHL) to any potential liability.

[4]Petitioner conceded in its brief that "the sale of the Clinpath stock to NHL was prearranged prior to the spin-off transaction".

A.    Spinoff of Clinpath, Inc.

On October 5, 1993, petitioner formed Clinpath, Inc.
(Clinpath), an Oklahoma general business corporation.  Pursuant
to a subscription agreement between petitioner and Clinpath,
dated October 6, 1993, petitioner agreed to purchase 14,399
shares of the common stock of Clinpath, representing 100 percent
of the issued shares of Clinpath.

On October 29, 1993, petitioner and its shareholders entered
into a reorganization agreement in which they agreed, among other
things, that:  (1) Petitioner shall contribute all of its
clinical laboratory assets to Clinpath in exchange for 14,399
shares of Clinpath stock issued to petitioner; and (2) after the
exchange of petitioner's clinical laboratory assets for Clinpath
stock, petitioner promptly shall distribute all of the Clinpath
stock to petitioner's shareholders in proportion to their
ownership of stock in petitioner.  Also, on October 29,
petitioner transferred the clinical laboratory assets, including
goodwill, to Clinpath, and Clinpath transferred 14,399 shares of
its common stock to petitioner.  Petitioner's adjusted basis in
the Clinpath stock it received equaled $105,015, its adjusted
basis in the clinical laboratory assets it transferred to
Clinpath in exchange for the stock.

On October 30, 1993, petitioner distributed 100 percent of
the Clinpath stock to petitioner's shareholders in proportion to

their stock ownership.  Clinpath conducted no business during the period from October 5, 1993, the date of Clinpath's incorporation, through October 30, 1993.

B.    Sale of Clinpath Stock to NHL

Pursuant to an acquisition agreement dated October 30, 1993, on October 30, 1993, immediately following the distribution of Clinpath stock to petitioner's shareholders, Clinpath shareholders[5] transferred all of the issued and outstanding Clinpath stock to NHL in exchange for $5,530,000.  The purchase price paid by NHL for the Clinpath stock was negotiated and agreed upon by unrelated parties at arm's length.

As a condition precedent to the sale, NHL demanded that each of Clinpath's physician-shareholders execute covenants not to compete, dated October 30, 1993.  The covenants not to compete provided that each of the physician-shareholders agreed not to compete with NHL in the clinical laboratory business anywhere within the 918 area code of the State of Oklahoma for 5 years, except as provided in the contract.  NHL paid each of the physician-shareholders $10,000, or a total of $70,000, in exchange for the covenants not to compete.  The total

_____

[5]Before completing the sale to NHL, petitioner's shareholders transferred 244 shares of the Clinpath stock they received from petitioner to the profit-sharing plan of petitioner's business manager.  Consequently, the Clinpath shareholders consisted of petitioner's shareholders and the profit-sharing plan.

consideration, consisting of covenant payments and the purchase price of the Clinpath stock, was $5,600,000.  The consideration allocated to the covenants not to compete was negotiated and agreed upon by unrelated parties at arm's length.[6]

Neither petitioner nor its shareholders retained any ownership interest in Clinpath after October 30, 1993.

IV.  Petitioner's Earnings and Profits as of October 30, 1993

Petitioner had accumulated earnings and profits of at least $236,347 as of its taxable year beginning July 1, 1993. Petitioner did not prove whether petitioner and Clinpath had current earnings and profits as of October 30, 1993.

OPINION

I.  The Statutory Framework

Section 361(a) provides that "No gain or loss shall be recognized to a corporation if such corporation is a party to a reorganization and exchanges property, in pursuance of the plan of reorganization, solely for stock or securities in another corporation a party to the reorganization."  Section 368(a)(1) defines reorganization for purposes of section 361 to include:

---

[6]In connection with the sale of Clinpath stock, petitioner and NHL executed a consulting agreement, dated Oct. 30, 1993, providing for a continuing business relationship between petitioner and NHL for 5 years.  The consulting agreement reflected the desire of both petitioner and NHL to partner with each other to increase the competitive position of both entities in northeastern Oklahoma with respect to both clinical and anatomic pathology services.

> (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356; * * *

The above-described transaction, commonly referred to as a "D" reorganization, is sometimes used to divide an existing corporation on a tax-deferred basis into more than one corporation for corporate business purposes. In order for a divisive D reorganization to qualify for tax-deferred treatment at the corporate level under section 361, however, there must be a qualifying distribution of stock under section 355.

In this case, petitioner divided its existing business into two parts by way of a spinoff. It transferred its clinical business to a newly formed subsidiary, Clinpath, in exchange for 100 percent of Clinpath's stock. Petitioner then immediately distributed the Clinpath stock to its shareholders in a transaction petitioner claims met the requirements of section 355.

If a spinoff does not qualify under section 355, it could result in a taxable dividend to the distributing corporation's shareholders under section 301 to the extent of corporate earnings and profits and in tax to the distributing corporation

computed in accordance with sections 311(b)(1) and 312. Secs. 355(c), 361(c). Section 311(b)(1) provides that, if a corporation distributes property to a shareholder in a transaction governed by sections 301 through 307 and the fair market value of such property exceeds its adjusted basis in the hands of the distributing corporation, then gain shall be recognized to the distributing corporation as if such property were sold to the distributee at its fair market value. Section 312(b) provides that, on a distribution of appreciated property by a corporation with respect to its stock, earnings and profits of the corporation are increased by the excess of the fair market value of the property over its basis.

## II. The Parties' Arguments

The primary issue in this case is whether petitioner's spinoff of Clinpath qualified as a valid reorganization under section 368(a)(1)(D). Respondent claims it did not so qualify because the distribution of Clinpath's stock to petitioner's shareholders did not qualify as a nontaxable distribution under section 355. Respondent asserts that the spinoff of Clinpath and the subsequent sale of Clinpath stock to NHL were, in reality, a prearranged sale by petitioner of its clinical business which failed to qualify as a reorganization under section 368 and a nontaxable distribution of stock to petitioner's shareholders under section 355. Consequently, respondent contends petitioner

realized and must recognize gain on the distribution of Clinpath stock. Sec. 311(b)(1). Petitioner disagrees, urging us to conclude that it structured the spinoff of its clinical business and the subsequent sale of Clinpath's stock for legitimate corporate business purposes and that the spinoff satisfied the requirements of sections 368(a)(1)(D) and 355. Therefore, petitioner contends, it is not required to recognize gain on the distribution of Clinpath stock to its shareholders.

Respondent also argues that, in calculating the gain to petitioner under section 311(b)(1) as a result of the failed reorganization, the fair market value of the Clinpath stock must be measured by the price paid by NHL for that stock. Petitioner agrees that the amount of corporate gain, if any, resulting from the distribution is based on the excess of the fair market value of the Clinpath stock over petitioner's basis in the stock but argues that the fair market value of the stock must be measured by the underlying value of the clinical business's assets contributed by petitioner to Clinpath on October 29, 1993.

In order to resolve these disputes, we must first decide whether the distribution of Clinpath stock to petitioner's shareholders met the section 355 requirements. We conclude that it did not for the reasons set forth below.

III. <u>Section 355 Distribution</u>

Section 355(a)(1) permits a nontaxable distribution by a corporation to its shareholders of stock in a controlled corporation if the distribution meets four statutory requirements: (1) Solely stock of a controlled corporation is distributed to shareholders with respect to their stock in the distributing corporation; (2) the distribution is not used principally as a device for the distribution of earnings and profits of the distributing corporation or the controlled corporation or both; (3) the requirements of section 355(b) (relating to active businesses) are satisfied; and (4) all of the controlled corporation's stock held by the distributing corporation, or an amount constituting control, is distributed. Sec. 355(a)(1). In addition to these statutory requirements, the regulations under section 355 require that the distribution have an independent corporate business purpose and that there be continuity of proprietary interest after the distribution. Sec. 1.355-2(b) and (c), Income Tax Regs.

Respondent argues that the distribution of Clinpath stock to petitioner's shareholders failed to satisfy the requirements of section 355 because: (1) The distribution of Clinpath stock was a device for the distribution of earnings and profits in violation of section 355(a)(1)(B); (2) the spinoff of Clinpath lacked a valid corporate business purpose as required by section 1.355-

2(b), Income Tax Regs.; and (3) the prearranged sale of Clinpath stock on the same date as the distribution of Clinpath stock to petitioner's shareholders violated the continuity of proprietary interest requirement of section 1.355-2(c), Income Tax Regs. Petitioner, on the other hand, argues that the transaction met all the requirements of section 355 and related regulations.  We examine the parties' arguments below.

A.    Nondevice Requirement of Section 355(a)(1)(B)

A transaction fails to qualify under section 355 if that transaction is used principally as a device for the distribution of the earnings and profits of the distributing corporation, the controlled corporation, or both.  Sec. 355(a)(1)(B); see also sec. 1.355-2(d)(1), Income Tax Regs.  We analyze whether a transaction was used principally as a device for distributing earnings and profits by examining all the facts and circumstances, including, but not limited to, the presence of the device factors listed in section 1.355-2(d)(2), Income Tax Regs., and the presence of the nondevice factors listed in section 1.355-2(d)(3), Income Tax Regs.

Petitioner essentially concedes that there is evidence of device as described in section 1.355-2(d)(2), Income Tax Regs.; however, it argues that a lack of substantial earnings and profits, sec. 1.355-2(d)(5), Income Tax Regs., and a corporate

business purpose, sec. 1.355-2(d)(3), Income Tax Regs., outweigh any evidence of device.

1.    Device Factors

Section 1.355-2(d)(2), Income Tax Regs., identifies the following factors as evidence that a transaction was a device for the distribution of a corporation's earnings and profits:  (1) Pro rata distribution among the shareholders of the distributing corporation and (2) subsequent sale or exchange of stock of the distributing or the controlled corporation.  Our analysis of these factors is set forth below.

A distribution that is pro rata or substantially pro rata among shareholders of the distributing corporation is more likely to be used principally as a device and is evidence of device. Sec. 1.355-2(d)(2)(ii), Income Tax Regs.  Petitioner does not dispute that the Clinpath stock was distributed pro rata to petitioner's shareholders.  The parties stipulated that pursuant to the reorganization agreement, petitioner would and did distribute all the Clinpath stock to its shareholders in proportion to their stock ownership in petitioner.  This factor is evidence of device.

A sale or exchange of the distributing or controlled corporation's stock after a distribution is also evidence of device.  Sec. 1.355-2(d)(2)(iii)(A), Income Tax Regs.  Generally, the greater the percentage of stock sold and the shorter the

period of time between the distribution and the sale or exchange, the stronger the evidence of device. Id. On brief, petitioner concedes "100% of Clinpath's stock was sold to NHL, and the distribution and the subsequent sale of stock occurred on" October 30, 1993.

In addition, a sale or exchange negotiated or agreed upon before the distribution is substantial evidence of device. Sec. 1.355-2(d)(2)(iii)(B), Income Tax Regs. On brief, petitioner concedes that "there is no question that the sale of the Clinpath stock to NHL was prearranged prior to the spin-off transaction in which the clinical laboratory assets of Petitioner were transferred to Clinpath." Indeed, the sale of Clinpath stock to NHL was discussed, negotiated, and agreed upon by NHL and petitioner and was anticipated by both parties well before the distribution. Sec. 1.355-2(d)(2)(iii)(D), Income Tax Regs. This factor is substantial evidence of device.

We conclude, based on a review of the applicable factors, that the facts and circumstances of this case present substantial evidence of device within the meaning of section 355(a)(1)(B).

2. Nondevice Factors and
Absence of Earnings and Profits

In order to overcome the substantial evidence of device, petitioner argues that: (1) Although both petitioner and Clinpath had some accumulated earnings and profits during the periods in question, these amounts were not significant enough to

warrant the conclusion that the spinoff of Clinpath was a device in contravention of section 355(a)(1)(B), and (2) several compelling corporate business purposes drove the entire transaction.

a.    <u>Earnings and Profits</u>

Section 1.355-2(d)(5), Income Tax Regs., specifies three types of distributions that ordinarily do not present the potential for tax avoidance and will not be considered to have been used principally as a device for the distribution of earnings and profits even if there is other evidence of device. A distribution that takes place at a time when neither the distributing nor the controlled corporation has earnings or profits is one of the distributions described in section 1.355-2(d)(5), Income Tax Regs., and is the only type of distribution thus described that petitioner argues applies in this case.

A distribution ordinarily is considered not to have been used principally as a device if:  (1) The distributing and controlled corporations have no accumulated earnings and profits at the beginning of their respective taxable years; (2) the distributing and controlled corporations have no current earnings and profits as of the date of the distribution; and (3) no distribution of property by the distributing corporation immediately before the separation would require recognition of gain resulting in current earnings and profits for the taxable

year of the distribution. Sec. 1.355-2(d)(5)(ii), Income Tax Regs. Petitioner claims that the distribution at issue here satisfies these requirements.

In its opening brief, petitioner concedes, "that the balance sheet for * * * [petitioner] as of June 30, 1993, reflected current and accumulated earnings and profits of $252,928.64, for both the anatomic and clinical pathology portions of * * * [petitioner's] business."[7] Petitioner argues, however, that:

> While petitioner concedes that it and Clinpath had some earnings and profits during the periods in question, these amounts were not meaningful and certainly do not provide a basis for a "bailout" of these earnings and profits amounts in order to avoid dividend treatment to Petitioner's shareholders.

Respondent disagrees, contending that the presence of any earnings and profits precludes petitioner from utilizing section 1.355-2(d)(5)(ii), Income Tax Regs., and that there is no credible evidence that petitioner lacked accumulated or current earnings and profits on the distribution date.

We agree with respondent for several reasons. First, petitioner reported it had over $230,000 of accumulated earnings and profits as of July 1, 1993, and petitioner did not introduce any evidence to prove that it had no current earnings and profits as of October 30, 1993. Section 1.355-2(d)(5)(ii)(A) and (B),

---

[7]Petitioner also reported on its Federal income tax return for the taxable year beginning July 1, 1993, that it had accumulated earnings and profits of $236,347 as of July 1, 1993.

Income Tax Regs., emphasizes that a distribution ordinarily will not be considered to have been used principally as a device if the distributing and controlled corporations have "no accumulated earnings and profits at the beginning of their respective taxable years" and "no current earnings and profits as of the date of the distribution". (Emphasis added.) Section 1.355-2(d)(5)(ii), Income Tax Regs., does not provide a safe harbor for corporations with "insignificant" or "minimal" earnings and profits, as petitioner contends.

Second, petitioner ignores the fact that the spinoff enabled it to claim that the substantial gain on the distribution of Clinpath stock to its shareholders, which ordinarily would have increased its current and accumulated earnings and profits, need not be recognized for corporate income tax purposes or reflected in the calculation of its earnings and profits as of October 30, 1993 and at yearend. Respondent argues that, if the spinoff of Clinpath did not qualify for tax-free treatment under sections 368 and 355, the distribution of Clinpath stock to petitioner's shareholders would be taxable under section 311(b) and, therefore, would have generated substantial current earnings and profits to petitioner under section 312(b) as of October 30, the date of the distribution.

Neither party disputes that, if the spinoff of Clinpath does not qualify as a tax-free transaction under sections 368 and

355, petitioner must realize and recognize substantial gain as of the date of distribution, sec. 311(b)(1), which will substantially increase petitioner's earnings and profits, sec. 312(b). Nevertheless, petitioner dismisses the prospect that it would have substantial current earnings and profits as a result of the spinoff[8] and overlooks what respondent describes as "the conspicuous fact that the corporate profits petitioner's shareholders clearly intended to bail out were the anticipated profits of the prearranged sale." Despite petitioner's efforts to suggest otherwise, we simply are not convinced that the decision to structure this transaction as a spinoff and subsequent stock sale was prompted by NHL; NHL usually structured its acquisitions as asset sales to minimize its exposure to liabilities that can arise from the purchase of an active business. Petitioner's protestations notwithstanding, the spinoff of Clinpath followed immediately by a prearranged sale of the Clinpath stock on the same day appears to have been designed to eliminate the corporate-level tax that would have been due had

---

[8]Petitioner acknowledges that dividends paid to its shareholders result "in a fairly significant double income tax liability, and is the primary reason that * * * [petitioner] distributes most or all of its income to its employee shareholders and other employees prior to year end", presumably as deductible compensation. Petitioner claims, however, that its practice of distributing income "virtually assures that there would be little or no corporate income tax liability * * * irrespective of the ultimate outcome of the spin-off transaction."

petitioner sold its clinical business to NHL directly or distributed its clinical business to its shareholders prior to any sale.

For the reasons set forth above, petitioner has failed to prove that it did not have accumulated or current earnings and profits as of the date of the distribution within the meaning of section 1.355-2(d)(5)(ii), Income Tax Regs.

### b. Corporate Business Purpose

The presence of a valid corporate business purpose may trump a conclusion that the transaction was used principally as a device for the distribution of earnings and profits. Sec. 1.355-2(b)(4),(d)(3)(ii), Income Tax Regs. Section 1.355-2(b)(2), Income Tax Regs., defines "corporate business purpose" as a "real and substantial non-Federal tax purpose germane to the business of the distributing corporation, the controlled corporation, or the affiliated group * * * to which the distributing corporation belongs."

The stronger the evidence of device, such as the presence of the device factors specified in section 1.355-2(d)(2), Income Tax Regs., the stronger the corporate business purpose required to prevent the conclusion that the transaction was used principally as a device. Sec. 1.355-2(d)(3), Income Tax Regs. The assessment of the strength of the business purpose must be made based upon all the facts and circumstances, including, but not

limited to: (1) The importance of achieving the purpose to the success of the business; (2) the extent to which the transaction is prompted by a person not having a proprietary interest in either corporation, or by other outside factors beyond the control of the distributing corporation; and (3) the immediacy of the conditions prompting the transaction. Sec. 1.355-2(d)(3)(i) and (ii), Income Tax Regs.

Petitioner identifies three purported corporate business purposes for the disputed distribution: (1) Increased competition caused by a changing economic environment that favored the larger, national laboratories; (2) Oklahoma State law restricting the ownership of petitioner to licensed physicians or physician-owned entities licensed to practice medicine within Oklahoma; and (3) NHL's requirement that each of petitioner's physician-shareholders sign binding and enforceable covenants not to compete in the clinical laboratory business. Respondent contends there was no valid corporate business purpose for the distribution. We consider each of the purported corporate business purposes below.

### i. Increased Competition

The first purported corporate business purpose asserted by petitioner is that the changing economic environment in the clinical laboratory market in 1993 favored the large, national laboratories over the smaller clinical laboratories, such as

petitioner's.  This environment, petitioner contends, was caused by increasing competition from national clinical laboratories, delivery of service issues, and development of alliances between large health insurance companies and national clinical laboratories.  Petitioner argues that, based upon these economic factors, its shareholders and employees became convinced that petitioner's clinical laboratory would be forced out of business within a few years.  This belief led the shareholders to sell the clinical business to NHL and "partner" with NHL to enhance the competitive position of their remaining anatomic business.

We do not question, and respondent does not dispute, that the economic factors cited by petitioner may have forced it out of the clinical business within a few years.  Although these factors may have been the impetus behind the decision to sell the clinical business in the first instance, such factors do not demonstrate a corporate business purpose for petitioner's decision to distribute the Clinpath stock to its shareholders before selling the stock to NHL.  A transfer of the clinical laboratory assets directly to Clinpath would have sufficed to achieve petitioner's desired result; i.e., to create a new company containing solely the assets of the clinical business in order to sell the clinical business with minimum liability to the buyer.  Minimizing the effect of the economic factors cited by petitioner, however, did not require the nearly simultaneous

distribution of Clinpath stock to its shareholders.  The purpose of separating the clinical laboratory assets in preparation for the sale to NHL and shielding NHL from liability was achieved as soon as the clinical business was contributed to Clinpath by petitioner in exchange for Clinpath stock.  See generally sec. 1.355-2(b)(5), Example (3), Income Tax Regs.

The changing economic environment, therefore, does not by itself constitute a valid corporate business purpose for the distribution of Clinpath stock to petitioner's shareholders or constitute evidence of nondevice.

### ii.   Petitioner's Status as a Professional Corporation

The second purported corporate business purpose arises from petitioner's claim that Oklahoma State law mandated the final structure of the spinoff transaction.  Petitioner essentially argues that it was constrained from selling, and NHL was prevented from purchasing, petitioner's stock because petitioner's status as a professional corporation prevented NHL from owning any interest in it.

Petitioner's argument concerning its status as a professional corporation is without merit.  Even if petitioner were precluded from selling its stock to nonphysicians as petitioner contends, such a bar would justify only petitioner's decision to transfer its clinical business to a separate general business corporation, i.e., Clinpath; it would not lend support

to petitioner's decision to distribute Clinpath stock to petitioner's shareholders. Indeed, petitioner could have sold the Clinpath stock directly to NHL without first transferring the Clinpath stock to its shareholders.[9]

We conclude, therefore, that petitioner's status as a professional corporation does not provide a valid corporate business purpose for the distribution of Clinpath's stock to petitioner's shareholders and is not evidence of nondevice.

### iii. Covenants Not To Compete

The third purported corporate business purpose cited by petitioner is NHL's requirement that each of Clinpath's physician-shareholders sign a binding and enforceable covenant not to compete. Relying upon Bayly, Martin & Fay, Inc. v. Pickard, 780 P.2d 1168 (Okla. 1989), petitioner contends that representatives for both petitioner and NHL believed that a covenant not to compete would be enforced under Oklahoma State law only if it were entered into in connection with the sale of goodwill or the dissolution of a partnership. Petitioner

---

[9]Pulliam v. Commissioner, T.C. Memo. 1997-274, a case on which petitioner relies, is distinguishable because the spinoff and subsequent prearranged sale of some of the distributed stock involved in Pulliam could not have been structured as a direct sale of stock between the distributing corporation and the third-party purchaser (a former employee). We concluded that the structure of the transaction was compelled by applicable State law, which prohibited a corporation from owning a funeral business, and by the need to structure the stock sale as an installment sale.

contends that the final structure of the transaction as a sale of Clinpath stock by Clinpath's shareholders, and not by petitioner, was mandated by NHL's desire to obtain from the shareholders valid and enforceable covenants not to compete. Therefore, a corporate business purpose existed for the distribution of Clinpath stock to the shareholders.

We do not agree. Even if we were to conclude that NHL's desire to obtain enforceable covenants not to compete qualified as a corporate business purpose of either petitioner or Clinpath, as section 1.355-2(b)(2), Income Tax Regs., requires, we would still reject petitioner's argument. Okla. Stat. Ann. tit. 15, sec. 217 (West 1986 and Supp. 2000), provides that "Every contract by which any one is restrained from exercising a lawful profession, trade or business of any kind, otherwise than as provided by Sections 218 and 219 of this title, is to that extent void." Oklahoma State courts interpret Okla. Stat. Ann. tit. 15, sec. 217, to prohibit only <u>unreasonable</u> restraints on the exercise of a lawful profession, trade, or business. <u>Bayly, Martin & Fay, Inc. v. Pickard</u>, <u>supra</u> at 1172; <u>Crown Paint Co. v. Bankston</u>, 640 P.2d 948, 952 (Okla. 1981); <u>Bd. of Regents v. Natl. Collegiate Athletic Association</u>, 561 P.2d 499, 508 (Okla. 1977). The majority rule is that reasonable restrictions will be enforced. <u>Bayly, Martin & Fay, Inc. v. Pickard</u>, <u>supra</u> at 1170-1171. Even unreasonable contracts in restraint of trade, which

are normally void and unenforceable under Oklahoma State law, are enforceable if they fall within one of the two statutorily created exceptions to the general rule--covenants given in connection with the sale of goodwill or covenants given in connection with the dissolution of a partnership. Okla. Stat. Ann. tit. 15, secs. 218 and 219 (West 1986 and Supp. 2000); <u>Bayly, Martin & Fay, Inc. v. Pickard</u>, <u>supra</u> at 1170. Assuming the covenants in this case were reasonable and/or were given in connection with the sale of goodwill, it was unnecessary to first distribute the Clinpath stock to petitioner's shareholders.[10] Petitioner has failed to demonstrate either that the covenants in question were unreasonable or that they were not adequately tied to the sale of goodwill under Oklahoma State law.

We conclude, therefore, that NHL's demand for binding and enforceable covenants not to compete does not constitute a corporate business purpose within the meaning of section 1.355-2(d)(3)(ii), Income Tax Regs., and, therefore, is insufficient to overcome the substantial evidence of device in this case.[11]

---

[10]Petitioner in its posttrial briefs appears to concede that the sale of Clinpath involved the sale of both "practice goodwill" inherent in the going concern value of the clinical business and "professional goodwill" possessed by petitioner's physician-shareholders.

[11]Even if we were to conclude that any of the alleged corporate business purposes satisfied the requirements of sec. 1.355-2(d)(3)(ii), Income Tax Regs., we would still conclude that, under the balancing test required by the regulations, the

(continued...)

### 3. Conclusion

There is substantial evidence of device in this case, which is not overcome by substantial evidence of nondevice or by proof that petitioner and Clinpath lacked current or accumulated earnings and profits. We hold, therefore, that the distribution of Clinpath stock failed to satisfy the requirements of section 355(a)(1).[12]

## IV. Tax Treatment of the Distribution of Clinpath Stock

Section 311(a) provides that, except as provided in section 311(b), no gain or loss shall be recognized to a corporation on a nonliquidating distribution, with respect to its stock, of its stock or property. Section 311(b)(1), however, requires a corporation to recognize gain on nonliquidating distributions of appreciated property to its shareholders as though such property were sold to the distributee at its fair market value.

It is well settled that fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts.

---

[11](...continued) evidence of corporate business purpose was insufficient to overcome the compelling evidence of device in this case.

[12]Because we hold that the sec. 355(a)(1) requirement is not met, we do not separately decide whether the independent corporate business purpose requirement of sec. 1.355-2(b)(1), Income Tax Regs., or the continuity of proprietary interest requirement of sec. 1.355-2(c)(1), Income Tax Regs, has been met.

United States v. Cartwright, 411 U.S. 546, 551 (1973); Morris v. Commissioner, 70 T.C. 959, 988 (1978). The determination of fair market value is a question of fact. Hamm v. Commissioner, 325 F.2d 934, 938 (8th Cir. 1963), affg. T.C. Memo. 1961-347; Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

The parties agree that if we hold the distribution of Clinpath stock to petitioner's shareholders did not qualify as a section 355 transaction, as we have, then the amount of corporate gain resulting from the distribution is the excess of the fair market value of the Clinpath stock in the hands of petitioner over petitioner's adjusted basis in the stock. The parties do not dispute that petitioner's adjusted basis in the clinical laboratory assets, and, accordingly, the Clinpath stock, was $105,015. The parties disagree, however, as to how the fair market value of the Clinpath stock should be measured.

Respondent contends that the fair market value of the Clinpath stock petitioner received and distributed to its shareholders on October 30, 1993, should be measured by the price paid by NHL for the Clinpath stock. NHL purchased the Clinpath stock for $5,530,000 on the same day the stock was distributed to petitioner's shareholders. Petitioner argues in effect that the purchase price paid by NHL for the Clinpath stock was excessive and urges us to conclude instead that the fair market value of the Clinpath stock should be measured by the fair market value of

the clinical laboratory assets contributed by petitioner to Clinpath. At trial, Harry Joe Wells, Jr., an expert witness called by petitioner, testified that the fair market value of the clinical laboratory assets, including going-concern value, was $1,040,000. Petitioner contends that the Clinpath stock could not possess a value in excess of the fair market value of its underlying clinical laboratory assets, given Clinpath's status as a new corporation with no operating history; therefore, the focus of section 311(b) in this case should be the fair market value of the clinical laboratory assets. Petitioner relies upon our decision in Pope & Talbot, Inc. v. Commissioner, 104 T.C. 574, 579 (1995), affd. 162 F.3d 1236 (9th Cir. 1999), the first of three decisions involving Pope & Talbot, Inc.,[13] as support for its position. Hereinafter, for clarity, we shall refer to the relevant decision as Pope & Talbot, Inc. I.

In Pope & Talbot, Inc. I, the taxpayer corporation, pursuant to a plan of distribution, transferred its timber and land development properties and related assets located in the State of Washington (collectively referred to as the Washington properties) to a newly formed Delaware limited partnership (partnership). The partnership's initial partners were two newly formed corporate general partners, which initially were owned

---

[13]See also Pope & Talbot, Inc. v. Commissioner, T.C. Memo. 1997-116, supplemented by T.C. Memo. 1997-399, affd. 162 F.3d 1236 (9th Cir. 1999).

equally by two of the taxpayer's principal shareholders.  Upon transfer of the Washington properties to the partnership, the managing general partner made a pro rata distribution of the interests in the partnership (partnership units) to the taxpayer's shareholders on the basis of one partnership unit for each 5 shares of common stock.  The taxpayer was not a partner in the partnership and received no partnership units.

The issue decided in Pope & Talbot, Inc. I was whether gain from the distribution of appreciated property under former section 311(d),[14] the predecessor to section 311(b)(1), is determined as if the taxpayer had sold the Washington properties in their entirety for their fair market value, or by reference to the value of the property interests, i.e., the partnership units, received by each shareholder. We concluded that gain from the distribution of appreciated property under former section 311(d) must be determined as if the taxpayer had sold the Washington properties for their fair market value on the date of the distribution.  Pope & Talbot, Inc. v. Commissioner, supra at 584.

We reached our conclusion by examining the language and purpose of former section 311(d).  Former section 311(d), like section 311(b)(1), required gain to be calculated "as if the property distributed had been sold at the time of the

---

[14]Sec. 311(d)(1) was amended and recodified as sec. 311(b)(1) by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631(c), 100 Stat. 2272.

distribution." Pope & Talbot, Inc. v. Commissioner, supra at 577. Because we were unable to answer with certainty the question of what property interest had to be valued under former section 311(d) after examining the statutory language, we examined the legislative history and concluded that "the purpose underlying section 311(d) was to tax the appreciation in value that had occurred while the distributing corporation held the property and to prevent a corporation from avoiding tax on the inherent gain by distributing such property to its shareholders." Pope & Talbot, Inc. v. Commissioner, supra at 579.

We face a different dispute from that decided by this Court in Pope & Talbot, Inc. I. In Pope & Talbot, Inc. I, we only decided what property interest had to be valued for purposes of section 311(d). In this case, the parties agree that the property distributed by petitioner to its shareholders was the Clinpath stock. The disagreement in this case relates only to the valuation of that stock for purposes of section 311(b). Although petitioner urges us to apply Pope & Talbot, Inc. I as a limitation on our analysis of the fair market value of the Clinpath stock, we must reject petitioner's plea because valuation was not the issue decided in Pope & Talbot, Inc. I. Thus, our decision in Pope & Talbot, Inc. I is distinguishable.

In order to calculate the gain that petitioner must recognize under section 311(b)(1), we must decide the fair market

value of the Clinpath stock in the hands of petitioner as if such property were sold to its shareholders at fair market value. Sec. 311(b)(1). Fair market value is defined for Federal tax purposes as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. at 551 (quoting sec. 20.2031-1(b), Estate Tax Regs.). In general, the best evidence of fair market value is "actual sales made in reasonable amounts and at arm's length within a reasonable time before or after the date for which a value is sought." Morris v. Commissioner, 70 T.C. at 988; see also Estate of Fitts v. Commissioner, 237 F.2d 729 (8th Cir. 1956), affg. T.C. Memo. 1955-269.

In this case, there was an actual third-party sale of the Clinpath stock to NHL on the same day as the distribution of the Clinpath stock to petitioner's shareholders. Petitioner contends, however, that the fair market value of the Clinpath stock as of October 30, 1993, cannot exceed the fair market value of the clinical business's assets contributed to Clinpath by petitioner. Petitioner introduced into evidence a report by Harry Joe Wells, Jr., which it claims valued "selected" assets as of October 30, 1993, but which, in reality, purported to value the clinical business as a "going business" as of October 29,

1993.  The Wells report, using an indirect method of valuation, concluded that the value of the clinical business was only $1,040,000, including the alleged value of corporate goodwill. Citing our decisions in <u>Norwalk v. Commissioner</u>, T.C. Memo. 1998-279, and <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. 189 (1998), petitioner contends that the $4,490,000 difference between the value determined in the Wells report and the purchase price paid for the Clinpath stock is attributable to professional goodwill generated by and belonging to its physician-shareholders.[15]

We reject the Wells report because it did not value the property distributed to petitioner's shareholders as of the date of distribution as required by section 311.  Instead, the Wells report valued "selected" assets of petitioner as of October 29, 1993, the day before the Clinpath stock was distributed to petitioner's shareholders and then sold to NHL pursuant to a prearranged deal.  The Wells report did not consider the prearranged stock sale to NHL, did not focus on the relevant date, and did not value the Clinpath stock.

---

[15]Petitioner's expert witness, on the other hand, testified that the difference between the purchase price paid by NHL and the value reconstructed in his report was paid for NHL's own "synergy".  Petitioner's expert could not and did not explain why NHL would pay over $4 million for a synergy NHL allegedly created.

We also reject the Wells report and petitioner's argument because they are simply not credible. Neither the Wells report nor petitioner's argument reconciles the conclusions reached regarding the value of the assets contributed to Clinpath ($1,040,000) and the amount of professional goodwill attributable to the physician-shareholders ($498,000) with what actually transpired in this case. In an arm's-length sale negotiated prior to October 29, 1993, between NHL and the physician-shareholders who had adverse interests, NHL paid $5,530,000 for the Clinpath stock and $70,000 for the covenants not to compete with the seven physician-shareholders. Neither petitioner nor its expert witness credibly explained how their positions on valuation reconcile with these facts. The physician-shareholder who testified at trial did not admit that the covenants not to compete had been undervalued in the negotiations or agree that Clinpath's physician-shareholders had collectively mischaracterized over $4,000,000 of the amount they received from NHL as proceeds from the sale of capital assets rather than as ordinary income attributable to the covenants.

There is a compelling reason why we ordinarily view an actual and contemporaneous sale between unrelated parties having adverse interests as the best evidence of the fair market value of property--ordinarily, it is credible evidence. See Morris v. Commissioner, supra. In this case, the relevant sale is even

more credible because the sale involved the very asset we are required to value by section 311(b)(1), and the sale took place on the valuation date specified in section 311(b)(1); i.e., the date the Clinpath stock was distributed to petitioner's shareholders.

We hold, therefore, that the fair market value of the Clinpath stock on the date it was distributed to petitioner's shareholders equaled $5,530,000, the price negotiated and agreed upon as the stock's sale price to NHL.[16] We also hold that petitioner realized and must recognize gain of $5,424,985, calculated by subtracting petitioner's adjusted basis in the stock, $105,015, from the fair market value of the Clinpath stock, $5,530,000.

We have considered the remaining arguments of both parties for results contrary to those expressed herein and, to the extent not discussed above, find those arguments to be irrelevant, moot, or without merit.

---

[16]In his notice of deficiency, the Commissioner determined petitioner's gain to be $5,494,985. This amount was calculated by subtracting petitioner's basis in the Clinpath stock, $105,015, from the total consideration of $5,600,000 paid by NHL. The portion of the sale price allocated to the covenants not to compete, $70,000, was not subtracted from petitioner's gain as determined in the notice of deficiency. On brief, respondent conceded that the $70,000 represented the fair market value of the covenants not to compete and was not part of the value of the 14,399 shares of Clinpath stock.

To reflect the foregoing,

Decision will be entered
under Rule 155.