T.C. Memo. 2014-107

UNITED STATES TAX COURT

BROSS TRUCKING, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7710-11, 21182-11,      Filed June 5, 2014.
21199-11, 21230-11.

David V. Capes, Mark E. Goodman, and Sara G. Neill, for petitioners.

Catherine S. Tyson, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge: In these consolidated cases respondent issued four notices
of deficiency that stemmed from two trucking businesses and a possible
distribution of appreciated intangible assets.

-----

[1]Cases of the following petitioners are consolidated herewith: Chester L.
Bross, docket Nos. 21182-11 and 21199-11; and Mary D. Bross, Donor, docket
No. 21230-11.

[*2]   On January 14, 2011, respondent sent Bross Trucking, Inc., a notice of deficiency that determined an $883,800 corporate income tax deficiency and a section 6662 accuracy-related penalty of $176,760 for the 2004 tax year.[2]  On June 16, 2011, respondent sent Chester Bross a notice of deficiency that determined a $1,015,293 gift tax deficiency, a $406,117 section 6662 gross valuation misstatement penalty, and a $253,823 section 6651(a)(1) addition to tax for the 2004 tax year.  On June 16, 2011, respondent sent Chester Bross a notice of deficiency that determined a $246,577 gift tax deficiency and a $33,379 section 6662 accuracy-related penalty for the 2006 tax year.  On June 16, 2011, respondent also sent Mary Bross a notice determining a $59,044 gift tax deficiency for the 2006 tax year.

Respondent contends that Bross Trucking, Inc., one of several Bross family businesses, distributed intangible assets to Chester Bross on February 1, 2004.  According to respondent, Mr. Bross then made a gift of the appreciated intangibles to his three sons, who organized a new trucking company, LWK Trucking Co., Inc.  The alleged value of the intangible assets would have required both filing a gift tax return and paying gift tax for tax year 2004.  In 2006 Mr. and Mrs. Bross

_____

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for the years in issue.

[*3] gave their sons shares of a family business holding company. The holding company had never owned Bross Trucking, Inc. Under respondent's view, Mr. and Mrs. Bross should have included the prior period taxable gifts of the appreciated intangibles in tax year 2004 on their 2006 gift tax returns.

After concessions,[3] the issues remaining for decision are: (1) whether Bross Trucking, Inc., distributed appreciated intangible assets to Mr. Bross on February 1, 2004, under section 311(b); (2) whether Mr. Bross gave any distributed intangible assets to his three sons in the 2004 tax year; (3) whether Bross Trucking is liable for an accuracy-related penalty for the 2004 tax year; (4) whether Mr. Bross is liable for an addition to tax for failing to file a gift tax return for the 2004 tax year; (5) whether Mr. or Mrs. Bross failed to include prior period taxable gifts on their 2006 gift tax returns; and (6) whether Mr. Bross is liable for an accuracy-related penalty for the 2006 tax year. In addition, the Court will address petitioners' motion to shift the burden of proof.

---

[3]As discussed below, the parties have reached an agreement as to the value of the holding company shares that Mr. and Mrs. Bross gave to their sons as gifts in tax year 2006. Any gift tax deficiencies for the 2006 tax year will be a computational matter determined according to Rule 155 for docket Nos. 21199-11 and 21230-11. Respondent also conceded that Mr. Bross is not liable for a sec. 6662(h) accuracy-related penalty for tax year 2004.

[*4]                              FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts, the exhibits attached thereto, and the exhibits admitted at trial are incorporated herein by this reference.

Mr. and Mrs. Bross resided in Hannibal, Missouri, during the tax years at issue and when they filed their petitions.  Bross Trucking, Inc. (Bross Trucking), had its primary place of business in Hannibal, Missouri, during the tax years at issue and when it filed its petition.

Mr. and Mrs. Bross have three sons and one daughter.

Mr. Bross entered the road construction industry in 1966.  Mr. Bross organized Bross Construction in 1972 to engage in various road construction projects.  Bross Construction's primary customers are the highway departments of Missouri, Illinois, and Arkansas.  As Mr. Bross's road construction projects grew, he organized several other companies to provide services and equipment to the construction projects.

Mr. Bross was extremely knowledgeable about the industry and contributed to nearly all facets of the Bross family businesses.  He learned about the road construction industry by "just [going] at it" to gain experience.  As the patriarch of the family and its businesses, he was responsible for arranging and completing the

[*5] projects in which Bross Construction participated. He personally developed relationships with the necessary entities to work in the road construction industry. Further, Mr. Bross was responsible for fostering and maintaining relationships under the Bross family business umbrella to ensure that projects were successfully completed.

I. Bross Trucking

On April 19, 1982, Mr. Bross organized Bross Trucking. Mr. Bross owned 100% of Bross Trucking directly or through his revocable living trust, the Chester L. Bross Revocable Trust, from organization through the periods at issue. Mr. Bross did not have an employment contract with Bross Trucking; and he never signed a noncompete agreement that would prohibit him from competing against Bross Trucking if he dissociated from the company. Further, none of Bross Trucking's employees signed noncompete agreements with the company. None of the three Bross sons has ever worked for Bross Trucking.

Bross Trucking engaged in hauling construction-related materials and equipment for road construction projects. Bross Trucking would also haul coal in the winter for other customers. However, Bross Trucking owned very little trucking equipment. Instead, Bross Trucking leased most of its equipment from another wholly owned Bross entity, CB Equipment, through yearly leases. Bross

**[*6]** Trucking paid for all the fuel and maintenance for the leased trucks.[4] Bross Trucking used independent contract drivers to provide the hauling services and did not otherwise employ drivers.

In the 1960s, when Mr. Bross first started his construction business, trucking was a highly regulated industry in Missouri with multiple obstacles that prevented easy entry into the market. The State of Missouri and the United States Department of Transportation (DOT) strictly prohibited the operation of a commercial trucking company in Missouri without specific authorization. In its early years Bross Trucking was forced to purchase previously issued authority from other companies in addition to obtaining its own authority because the State issued so few permits. Bross Trucking continued to operate under Missouri's highly regulated commercial trucking rules for almost 30 years until Missouri adopted a broader regulatory approach to intrastate trucking. It is now relatively easy to obtain trucking authority, and other regulation changes have also eased the path into Missouri commercial trucking.

---

[4]Bross Trucking likely received special pricing, but the reason for the discounts and the amounts of the discounts are not established. Bross Trucking's fuel suppliers include national companies such as Amoco, Conoco, and Phillips. Likewise, the parts suppliers included the national companies Mack Truck, Inc., Ford Motor Co., and International Harvester/Navistar. It was not established whether any pricing adjustments were made for the benefit of Bross Trucking or on behalf of the personal relationships of Mr. Bross.

[*7]   Mr. Bross, as sole owner of Bross Trucking, arranged the services for Bross Trucking's customers.[5]  Bross Trucking's principal customers were Bross Construction, CB Asphalt, and Mark Twain Redi-Mix, Inc.[6]  Mark Twain Redi-Mix was owned by Mrs. Bross and two of the Bross sons.[7]  Mr. Bross had close personal relationships with the owners of Bross Construction, CB Asphalt, and Mark Twain Redi-Mix because the owners were all Bross family members.  Bross Trucking, however, did not have any formal written service agreements with Bross Construction, CB Asphalt, or Mark Twain Redi-Mix.

Beginning in the late 1990s the DOT and Missouri Division of Motor Carrier and Railroad Safety (MCRS) conducted a series of audits and investigations of Bross Trucking over the course of several years.  A series of complaints was filed as a result of the investigations.  For example, on July 22, 1997, the MCRS filed its first complaint against Bross Trucking alleging a failure to require certain driver information.  Bross Trucking paid a $5,700 settlement for

---

[5]When asked at trial what role he played in Bross Trucking, Mr. Bross responded:  "I ran it."

[6]According to Mr. Bross, around 90-95% of Bross Trucking's customers were Bross family companies.

[7]During the tax years at issue Mrs. Bross as trustee of the Bross Rev. Trust owned 60% of Mark Twain Redi-Mix and two of the Bross sons each owned 20%.

[*8] the infraction. Soon after, the DOT conducted an independent investigation and notified Bross Trucking that it had received an "Unsatisfactory" Motor Carrier Safety Rating as of September 30, 1998. Bross Trucking was then in jeopardy of being forced to stop servicing its customers because the DOT had the authority to issue a cease and desist order against companies with unsatisfactory Motor Carrier Safety ratings. Further, the MCRS could have revoked Bross Trucking's hauling authority because of the negative investigation results. From then on, Bross Trucking was under perceived heightened regulatory scrutiny: Mr. Bross thought the regulatory entities stopped or inspected Bross Trucking trucks more than other trucking providers because of the company's negative regulatory history.

In response to the negative attention and the possibility of shutdown, Mr. Bross decided to cease Bross Trucking operations. One of Mr. Bross's three sons testified in regard to that period in time and he credibly recalled that he thought the regulatory authorities were "hounding" Bross Trucking and that Mr. Bross contemplated even switching trucking companies to avoid being left without trucks during construction season. Similarly, Bross Trucking's customers questioned whether Bross Trucking would continue to offer trucking services because of the potential shutdown resulting from the pending regulatory proceedings. The transportation attorney representing Bross Trucking suggested

**[*9]** that Bross Trucking should cease to perform hauling services rather than risk a potentially adverse cease and desist order. The attorney also suggested that Bross Trucking should remain a viable company to address any potential regulatory claims and obligations.

## II. LWK Trucking

In July 2003 Mr. Bross and his three sons met with an attorney to discuss the best way to ensure that the Bross family businesses had a suitable trucking provider. To meet their goals, the attorney recommended that the Bross sons start a new trucking business. The Bross sons agreed and decided to organize a new company called LWK Trucking.

The three Bross sons--although not previously involved in Bross Trucking--created a different type of trucking company that provided more services than Bross Trucking. The Bross sons used a different attorney experienced in the transportation industry to acquire the requisite authority, insurance, and safety inspections.

LWK Trucking was organized on October 1, 2003. Its stock was divided into two classes when it was organized: class A voting stock and class B nonvoting stock. Class A stock represented a 98.2% interest in LWK Trucking and class B stock represented the remaining 1.8%. In December of 2003 each of

[*10] the three Bross sons established a self-directed Roth IRA. Later that month, each of the Bross sons directed his respective Roth IRA to acquire 2,000 shares of class A shares in LWK Trucking. Together, the 6,000 shares acquired by the three Roth IRAs represented all of the class A shares in LWK Trucking, giving the three sons a combined 98.2% interest in LWK Trucking.[8] The remaining class B shares were acquired by an unrelated third party.

LWK Trucking was a new and separate entity from Bross Trucking. LWK Trucking was owned by the three Bross sons, but not Mr. Bross. Further, Mr. Bross was not involved in managing LWK Trucking. LWK Trucking chose to independently satisfy all the regulatory requirements instead of switching insurance and licenses over from Bross Trucking. Initially LWK Trucking was given only "new entrant" probationary authority until the company proved it had met all regulations. In other words, nothing was transferred from Bross Trucking to LWK Trucking and LWK Trucking met all of the requirements on its own. As a result, Bross Trucking remained a viable entity, complete with insurance and its original trucking authority issued or authorized by the State of Missouri. On December 31, 2003, Bross Trucking had $263,381.38 of assets. On February 1,

---

[8]As stated infra note 19, a discussion on the merits of this structure is not relevant to the issues in these cases and the Court does not address the validity of this transaction.

[*11] 2004, Bross Trucking had accounts receivable, which it continued to collect, and cash assets; the cash assets were never distributed and used only several years later to pay the legal expenses of the pending cases before the Court.[9]  LWK Trucking did hire several of the employees that had worked for Bross Trucking. In 2004 about 50% of LWK Trucking's employees had worked for Bross Trucking.[10]

LWK Trucking executed a new master vehicle equipment lease with CB Equipment after Bross Trucking's vehicle equipment lease had terminated.[11]  The new lease allowed LWK Trucking to use equipment that had previously been leased to Bross Trucking.  At the beginning of LWK Trucking's lease, some of the equipment still displayed Bross Trucking logos because LWK Trucking did not have time to re-logo all of the trucks.  Still believing those trucks were leased by Bross Trucking, the regulatory entities continued to closely monitor trucks marked with the Bross name.  LWK Trucking recognized the heightened scrutiny and used

---

[9]In December 2004 Bross Trucking's assets included $179,612.46 cash and prepaid taxes of $3,148.

[10]The parties stipulated this percentage, but it is unclear whether it includes contract drivers or only full-time employees.

[11]Bross Trucking did not own any trucks; it leased the trucks on a yearly basis from CB Equipment.

[*12] magnetic signs to cover the old name until the new company could afford to have the trucks repainted.

While LWK Trucking employed a similar business model to Bross Trucking for providing trucking services by leasing equipment from CB Equipment and hiring a significant number of independent contractors to fulfill customers' hauling orders, LWK Trucking expanded into other service lines. In 2004 LWK Trucking started and retained a controlling interest in One Star Midwest, LLC, which provides GPS products to construction contractors.[12] Further, after the initial startup LWK Trucking began using 11 mechanics as employees to provide repair services to third parties whereas Bross Trucking kept mechanics only to service its rental fleet. These service lines had not been offered by Bross Trucking.

III. Other Bross Family Businesses

Mr. Bross also organized CB Asphalt, which ran an asphalt plant for production and provided asphalt products for the construction projects. Both Bross Trucking and CB Asphalt leased equipment from CB Equipment. Later, LWK Trucking also leased equipment from CB Equipment.

---

[12]LWK Trucking owns 75% of One Star Midwest, Mr. Bross owns 20%, and an unrelated party owns the remaining 5%.

[*13] On August 22, 2001, Mr. Bross, Mrs. Bross, and their three sons organized Bross Holding Group. Initially the Brosses owned Bross Holding Group in the following percentages: Mr. Bross, 37.5%; Mrs. Bross, 25%; and each of the three Bross sons, 12.5%. Shortly after organization, Bross Holding Group acquired sole ownership of Bross Construction and CB Equipment. Later it acquired CB Asphalt. Mr. Bross never conveyed Bross Trucking to Bross Holding Group.

In 2006 Mr. and Mrs. Bross gave portions of Bross Holding Group to their three sons. The gifts included both class A voting shares and class B nonvoting shares. All of the underlying assets were appraised, and a valuation was timely prepared. Mr. and Mrs. Bross used the valuation, and each timely filed a Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return. Mr. and Mrs. Bross reported gifts for tax for years 1995 and 2006, but they did not report any gifts for tax year 2004, the year LWK Trucking began to do business.

IV. Procedural Background

On August 24, 2012, the cases at docket Nos. 7710-11, 21182-11, 21199-11, and 21230-11 were consolidated. On December 11, 2012, petitioners filed a motion to shift the burden of proof. On December 17, 2012, petitioners filed a motion in limine to exclude evidence. Petitioners object to certain documents which respondent has introduced into evidence with respect to financial

[*14] information for LWK Trucking after the alleged distribution date of February 1, 2004. Petitioners also object to evidence introduced regarding additional road construction funding made available from the State of Missouri through a state constitutional amendment.[13]

## OPINION

The key issues to be decided are whether Bross Trucking distributed appreciated intangible assets to its sole shareholder Mr. Bross, whether Mr. Bross then gave those assets to his sons, and whether the gifts should have been reported for tax year 2004. The Court's holdings on the second two issues depends on whether the Court finds for respondent on the first issue.

## I. Burden of Proof

Petitioners filed a motion to shift the burden of proof on December 11, 2012, and also asserted in their opening brief that the burden should shift to respondent. Generally, the Commissioner's determinations in a notice of deficiency are presumed correct and the taxpayer bears the burden of proving the

---

[13]In an order dated June 5, 2014, the Court denied in part and granted in part petitioners' motion in limine. Evidence of LWK Trucking's finances for 2003 and 2004 is relevant and was not excluded. Evidence related to LWK Trucking's finances for tax years including and after 2005 was allowed solely for the purposes of distinguishing between Bross Trucking and LWK Trucking. The evidence related to Missouri Constitutional Amendment 3 and the Missouri Smooth Roads Initiative was excluded because it is not relevant.

[*15] determinations are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners, however, contend that the burden should shift to respondent because respondent's determinations were arbitrary and excessive under facts similar to those of Estate of Mitchell v. Commissioner, 250 F.3d 696 (9th Cir. 2001), aff'g in part, vacating in part and remanding T.C. Memo. 1997-461, and Cohen v. Commissioner, 266 F.2d 5 (9th Cir. 1959), remanding T.C. Memo. 1957-172. Petitioners alternatively contend that the burden should shift under section 7491. It is unnecessary for the Court to address the parties' disagreements and to determine whether the burden of proof has shifted because the outcome of each of the present cases is determined on the preponderance of the evidence. See Blodgett v. Commissioner, 394 F.3d 1030, 1035 (8th Cir. 2005), aff'g T.C. Memo. 2003-212; Estate of Bongard v. Commissioner, 124 T.C. 95, 111 (2005).

II. Section 311

Section 311(b)(1) generally provides that if a corporation distributes appreciated assets to a shareholder, the corporation recognizes gain as if the property were sold to the shareholder at its fair market value. Gain is recognized to the extent that the property's fair market value exceeds the corporation's adjusted basis. See id.

**[\*16]** Section 311(b) was enacted in part to remedy a loophole created by <u>Gen. Util. & Operating Co. v. Helvering</u>, 296 U.S. 200 (1935), that allowed companies to avoid tax on certain distributions.  <u>See</u> <u>Pope & Talbot, Inc. v. Commissioner</u>, 162 F.3d 1236, 1239 (9th Cir. 1999), <u>aff'g</u> 104 T.C. 574 (1995).[14]  The purpose underlying section 311(b) was to tax the appreciation that had occurred while the distributing corporation held the property and to prevent a corporation from avoiding tax on the inherent gain by distributing such property to its shareholders.  <u>Pope & Talbot, Inc. v. Commissioner</u>, 104 T.C. at 579.  To achieve this result, section 311(b)(1) requires the distributing corporation to recognize the difference between the property's adjusted basis and its fair market value "as if such property were sold to the distributee at its fair market value."

Section 311(b) has two specific requirements that must both be met before a corporation must recognize any gain.  First, a corporation must distribute property to a shareholder in a distribution controlled by subpart A--sections 301 through 307.  Sec. 311(b)(1)(A); <u>see also</u> <u>McLaulin v. Commissioner</u>, 115 T.C. 255, 260 n.4 (2000), <u>aff'd</u>, 276 F.3d 1269 (11th Cir. 2001).  Second, the fair market value of

---

[14]The <u>Pope & Talbot</u> cases analyze sec. 311(d), the precursor to sec. 311(b)(1).  <u>See</u> <u>S. Tulsa Pathology Lab., Inc. v. Commissioner</u>, 118 T.C. 84, 103 (2002).

**[*17]** the property must exceed its adjusted basis in the hands of the distributing corporation. Sec. 311(b)(1)(B).

Respondent contends that Bross Trucking distributed the company's "operations" to Mr. Bross. Further, the notice of deficiency to Bross Trucking dated April 14, 2011, explained that the deficiency was based on distributed intangible assets. The deficiency is related to intangible assets with the following "attributes": (1) goodwill; (2) established revenue stream; (3) developed customer base; (4) transparency of the continuing operations between the entities; (5) established workforce including independent contractors; and (6) continuing supplier relationships. It is unclear whether respondent believes each of these "attributes" is a separate intangible asset or whether each "attribute" is aggregated into goodwill as a whole.

Respondent contends that it is not necessary to identify and value each specific distributed asset to satisfy section 311(b).

Section 311(b)(1)(A) supports an interpretation requiring the identification of property to satisfy the requirements. In order for a corporation to recognize gain under section 311(b), section 311(b)(1)(A) first requires a distribution governed by subpart A. The first section in subpart A--section 301(a)--incorporates the definition of property in section 317(a). Thus the definition of

[*18] property in section 317(a) is incorporated into section 311(b) through section 301(a). Section 317(a) defines property as money, securities, and any other property except for stock of the distributing corporation or rights to acquire such stock. Further, the definition in section 317(a) by its terms applies to part I of subchapter C, or sections 301 through 318. Accordingly, a distribution under section 311(b) must include some property as defined in section 317(a). Respondent's contention that asset identification is not required is unfounded because a section 311(b) distribution must be of property as defined in section 317(a).

Respondent does not specify what property was distributed by Bross Trucking. However, respondent's opening brief suggests that Bross Trucking distributed a single asset, goodwill, which included each of the separate "attributes" listed in the notice of deficiency.[15]

The calculation in the notice of deficiency also supports a conclusion that respondent alleges only a single asset was transferred. Section 311(b)(1)(B) requires the comparison between the asset's fair market value and its basis in order

---

[15]"Bross Trucking had appreciated assets, including intangibles such as goodwill, because of [sic] Bross Trucking had: established revenue stream, the developed customer base, the transparency of the continuing operations". Opening Br. for Respondent 64.

[*19] to calculate any recognizable gain. It would be impossible to perform this calculation and decide whether a corporation must recognize gain if the property was not at least identified. The calculation in the statute is straightforward, and respondent must have performed the calculation to make the adjustment in the notice of deficiency. Respondent made only one adjustment based on the deemed distribution, reflecting that in his view only one asset was transferred from Bross Trucking to Mr. Bross. Accordingly, the only reasonable interpretation of respondent's position is that Bross Trucking transferred only goodwill to Mr. Bross before he gave it to his sons.

Goodwill is often defined as the expectation of continued patronage. Newark Morning Ledger Co. v. United States, 507 U.S. 546, 555 (1993). Goodwill has also been defined as "'the sum total of those imponderable qualities which attract the custom of a business,--what brings patronage to the business.'" Philip Morris Inc. & Consol. Subs. v. Commissioner, 96 T.C. 606, 634 (1991) (quoting Boe v. Commissioner, 307 F.2d 339, 343 (9th Cir. 1962), aff'g 35 T.C. 720 (1961)), aff'd without published opinion, 970 F.2d 897 (2d Cir. 1992). The competitive advantage which constitutes goodwill is represented by a number of property rights or interests. See id. at 634. Accordingly, respondent's list of

**[\*20]** attributes in the notice of deficiency is apparently the separate interests or rights that respondent believed made up Bross Trucking's goodwill.

III.  Ownership of Intangible Assets

A business can distribute only corporate assets and cannot distribute assets that it does not own.  See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 209 (1998).  Specifically, a corporation cannot distribute intangible assets that are individually owned by its shareholders.

In Martin Ice Cream Co., an ice cream company distributed products (including Häagen-Dazs) to both supermarkets and small stores.  Id. at 192-193. Its controlling shareholder personally developed valuable relationships with the supermarkets, and the corporation spun off its supermarket distribution rights to a subsidiary wholly owned by that controlling shareholder, who then transferred them to Häagen-Dazs along with the subsidiary's business records, customer records, and associated goodwill.  Id. at 195-203.  The shareholder signed a consulting agreement and a noncompete agreement with Häagen-Dazs.  Id. at 203-204.  The Commissioner argued that the ice cream company should be taxed on the gain from the sale of the subsidiary; however, the Court held that the customer relationships and distribution rights were the shareholder's personal assets and not company assets.  Further, the company could not be taxed on Häagen-Dazs's

[*21] payments because the shareholder did not transfer the assets to the subsidiary. Id. at 206-209.

Martin Ice Cream Co. can be contrasted with Solomon v. Commissioner, T.C. Memo. 2008-102, where the goodwill of a pigment company was developed at the corporate level, independent of the shareholders. In Solomon, one branch of a pigment manufacturing company that started in 1927 was sold to a competitor in 2000. The taxpayers claimed that personal goodwill developed by certain shareholders was included in the purchase price and that the personal intangible assets should not be taxed at the corporate level. The Court held the success of the business was not solely attributable to the relationships and goodwill held by the shareholders but rather to the company's processing, manufacturing, and sale of pigments. In other words, the customers in Solomon continued to conduct business with Solomon because of Solomon's products, not because of the relationships formed with the shareholders.

These two cases suggest there are two regimes of goodwill: (1) personal goodwill developed and owned by shareholders; and (2) corporate goodwill developed and owned by the company. Bross Trucking's goodwill was primarily owned by Mr. Bross personally, and the company could not transfer any corporate goodwill to Mr. Bross in tax year 2004.

[*22] A.  <u>Bross Trucking's Goodwill Was Limited to a Workforce in Place</u>.

Bross Trucking might have had elements of corporate goodwill at some point but had lost most of it by the time of the alleged transfer.  Specifically, through various regulatory infractions Bross Trucking lost any corporate goodwill because of an impending suspension and the negative attention brought by the Bross Trucking name.  During the late 1990s and early 2000s Bross Trucking was investigated extensively by the DOT and the MCRS.  As a result of the investigations, Bross Trucking faced a possible suspension of operations and several fines because the authorities gave Bross Trucking unsatisfactory safety ratings.  Further, the various regulatory authorities were "hounding" Bross Trucking to the point that LWK Trucking wanted to immediately remove the Bross name from leased trucks to avoid their being spotted and stopped.

The impending suspension would cause customers to reevaluate whether to trust Bross Trucking and continue to do business with it.  Indeed, Mr. Bross expressed his concern to his attorney that Bross Trucking might not be able to perform necessary functions as a result of the suspension.  Mr. Bross's solution was to find or create another business to take over the trucking needs for the Bross family businesses.  This is the antithesis of goodwill:  Bross Trucking could not

[*23] expect continued patronage because its customers did not trust it and did not want to continue doing business with it.

Further, the lack of corporate goodwill is demonstrated by the necessity to separate LWK Trucking from Bross Trucking by hiding the Bross name on leased trucks.  Trade names and trademarks are the embodiment of goodwill.  Canterbury v. Commissioner, 99 T.C. 223, 252 (1992).  LWK Trucking specifically chose to quickly remove the Bross Trucking name from any leased equipment to avoid confusion between the two companies.  This shows that any transferred corporate goodwill was not valuable and may have actually been detrimental to LWK Trucking.  In other words, LWK Trucking was trying to hide any relationship with Bross Trucking because association with the targeted company was seen in a negative light.  A new company trying to use the transferred goodwill of another company would likely try to associate with the recognized company, not hide the company logo.

Mr. Bross credibly testified that Bross Trucking had relationships with several national suppliers for fuel and parts, but no evidence was submitted showing that LWK Trucking benefited from any transferred supplier relationships. Further, it is unclear whether Mr. Bross or Bross Trucking cultivated the supplier relationships.

[*24] The only attribute of goodwill that Bross Trucking may have corporately owned and transferred to Mr. Bross was a workforce in place. The record indicates that Bross Trucking employed several mechanics and an administrative staff to run the business. The company relied primarily on independent contract drivers to perform hauling services, and the record is not clear as to whether these drivers were counted as part of the workforce in place. Accordingly, the sole attribute of goodwill displayed by Bross Trucking was a workforce in place, and it is therefore the only attribute that the corporation could have distributed to Mr. Bross.

B. Nearly All the Goodwill Used by Bross Trucking Was Part of Mr.Bross's Personal Assets.

The remaining attributes assigned to Bross Trucking's goodwill all stem from Mr. Bross's personal relationships. Bross Trucking's established revenue stream, its developed customer base, and the transparency of the continuing operations were all spawned from Mr. Bross's work in the road construction industry.

Any established revenue stream, developed customer base, or transparency of continuing operations was a direct result of Mr. Bross's personal efforts and relationships. Like the shareholder in Martin Ice Cream Co., Mr. Bross developed

[*25] the crucial relationships with the businesses' customers. Bross Trucking's customers chose to patronize the company solely because of the relationships that Mr. Bross personally forged. Mr. Bross had close, personal relationships with the owners of Bross Trucking's primary customers. For example, Mark Twain Redi-Mix, a substantial Bross Trucking customer, was owned by Mr. Bross's wife and two sons. As with the taxpayer in Norwalk v. Commissioner, T.C. Memo. 1998-279, it is safe to assume that Bross Trucking's customers sought Mr. Bross' personal ability and reputation when hiring Bross Trucking because he was a successful construction businessman who has been in the road construction industry since the 1960s.

Bross Trucking may have had a developed revenue stream, but only as a result of Mr. Bross' having personal relationships with the customers. It follows that Bross Trucking's developed customer base was also a product of Mr. Bross' relationships. Mr. Bross was the primary impetus behind the Bross Family construction businesses, and the transparency of the continuing operations among the entities was certainly his personal handiwork.[16] His experience and

---

[16]None of the Bross sons contributed to Bross Trucking's goodwill because they were not employees of Bross Trucking. It was impossible for the Bross sons to own or transfer any goodwill from Bross Trucking to LWK Trucking because they were not involved in operating Bross Trucking. The sons helped with the

(continued...)

[*26] relationships with other businesses were valuable assets, but assets that he owned personally.

A company does not have any corporate goodwill when all of the goodwill is attributable solely to the personal ability of an employee. See MacDonald v. Commissioner, 3 T.C. 720, 727 (1944); Norwalk v. Commissioner, T.C. Memo. 1998-279. Unlike the taxpayer's products in Solomon v. Commissioner, T.C. Memo. 2008-102, Bross Trucking's products did not contribute to developing the goodwill. This is demonstrated in part by the services performed by Bross Trucking. Bross Trucking's business model involved hiring independent contractors to haul equipment and supplies around the State. There were very few obstacles to obtaining authority and directly hiring the independent contractors who performed the actual work for Bross Trucking. The State of Missouri's deregulation of the trucking industry allows new entrants to easily begin trucking operations. In other words, it was not Bross Trucking's product which enticed customers to use its services because the services were not unique. Cf. Schilbach v. Commissioner, T.C. Memo. 1991-556 (holding that a single-shareholder-owned

---

[16](...continued)
Bross family construction businesses in other capacities but remained uninvolved with the trucking services. Thus, there was no possibility that Bross Trucking could have benefited from relationships and assets developed by the Bross sons before they created LWK Trucking.

**[*27]** professional corporation possessed all of the goodwill because the corporation's services were unique and was not based on the ability of the shareholder). The expectation of continuing patronage must have been a result of the unique relationships between Mr. Bross and the customers.

  C. <u>Mr. Bross Did Not Transfer His Goodwill to Bross Trucking</u>.

  Mr. Bross did not transfer any goodwill to Bross Trucking through an employment contract or a noncompete agreement. A key employee[17] who develops relationships for his or her employer may transfer goodwill to the employer through employment contracts or noncompete agreements. <u>See</u> <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. at 207. The transfer is evidenced by the employee's covenant to not use his or her goodwill to compete against the employer. <u>O'Rear v. Commissioner</u>, 28 B.T.A. 698, 700 (1933) ("[I]t is at least doubtful whether a professional man can sell or dispose of any good will which may attach to his practice except perhaps by contracting to refrain from practicing."), <u>aff'd</u>, 80 F.2d 473 (6th Cir. 1935). In other words, an employee

---

  [17]Mr. Bross, much like the key employee in <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. 189 (1998), was the majority shareholder of the corporation and also performed services for the corporation without a written employment contract.

[*28] transfers the benefit of his or her relationships to an employer when the employee cannot benefit from the relationships without the employer.

An employer has not received personal goodwill from an employee where an employer does not have a right, by contract or otherwise, to the future services of the employee. See MacDonald v. Commissioner, 3 T.C. at 727-728. Mr. Bross did not have an employment contract with Bross Trucking and was under no obligation to continue working for Bross Trucking. A contractual duty to continue to use his or her assets for the benefit of the company may show that an employee transferred personal goodwill to an employer for the length of the obligation. Mr. Bross, however, was under no such obligation: he was free to leave the company and take his personal assets with him. Similarly, the lack of an employment contract shows that there was not an initial obligation for Mr. Bross to transfer any of his personal assets to Bross Trucking. Bross Trucking did not take an ownership interest in Mr. Bross' goodwill from the beginning because Mr. Bross never agreed to transfer those rights. Thus, the lack of an employment contract between Mr. Bross and Bross Trucking shows that Bross Trucking did not expect to--and did not--receive personal goodwill from Mr. Bross. Accordingly, Mr. Bross' personal goodwill remained a personal asset separate from Bross Trucking's assets.

**[\*29]** An employee may transfer personal goodwill to an employer through a covenant not to compete.  See <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. at 207-208; <u>H & M Inc. v. Commissioner</u>, T.C. Memo. 2012-290.  In those cases the Court held an employee did not transfer personal goodwill to the employer because he or she did not sign a noncompete agreement.  Similar to those taxpayers, Mr. Bross never transferred any personal goodwill to Bross Trucking by signing a noncompete agreement.  Much in the same way that Bross Trucking did not have any contractual expectation of continued services from Mr. Bross while he was an employee, Bross Trucking could also not expect to benefit from Mr. Bross's personal goodwill after he left the business.  Mr. Bross' freedom to use his personal goodwill in direct competition with Bross Trucking if he stopped working for the company shows that he did not transfer it to Bross Trucking.

IV.  <u>Transfer of Assets</u>

As noted above, a business can distribute only corporate assets and cannot distribute assets personally owned by shareholders.[18]  See <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. at 209.  Bross Trucking did not own and could not transfer

---

[18]In <u>Martin Ice Cream Co. v. Commissioner</u>, 110 T.C. at 217-220, the Court held that the key employee had to recognize gain under sec. 311(b) when the employer redeemed stock owned by the employee after a failed sec. 355 splitoff. Bross Trucking did not redeem any stock from Mr. Bross, and the facts under the sec. 311(b) analysis in <u>Martin Ice Cream Co.</u> are otherwise distinguishable.

**[\*30]** Mr. Bross's goodwill and did not transfer a workforce in place on February 1, 2004. Further, there is no evidence that Bross Trucking transferred any other intangible assets to Mr. Bross.[19]

As discussed above, the only aspect of corporate goodwill that Bross Trucking displayed was a workforce in place, but Bross Trucking did not transfer an established workforce in place to Mr. Bross. Respondent repeatedly contends that "most" of the Bross Trucking employees became LWK Trucking employees. The evidence, however, shows that only about 50% of LWK Trucking's employees formerly worked at Bross Trucking. The Court is unconvinced that most of a workforce in place was transferred when only 50% of the current employees were previously employees by the alleged transferor. Instead it appears that LWK Trucking assembled a workforce independent of Bross Trucking. This is demonstrated by the new key employees and services offered by LWK Trucking. Mr. Bross's sons managed LWK Trucking and also engaged in services different from those performed at Bross Trucking. For instance, in 2004 LWK Trucking

---

[19]Thus, Mr. Bross could not transfer Bross Trucking assets to his three sons, and it follows that the three Bross sons could not transfer Bross Trucking assets to each of their respective Roth IRAs. Accordingly, IRS Notice 2004-8, 2004-1, C.B. 333, is outside the scope of these cases because Bross Trucking and LWK Trucking never shared any assets. Further, a discussion on the structure of the Bross sons' ownership of LWK Trucking is outside the scope of this opinion.

[*31] started One Star Midwest, which sold GPS services, and LWK Trucking later started performing truck maintenance for third parties. Bross Trucking did not perform these services and could not have provided employees to start the separate service lines. LWK Trucking may have hired former Bross Trucking employees, but there is no evidence that these employees were transferred to LWK Trucking rather than hired away on their own merit. It is also unclear whether any of the alleged transferred employees that moved to LWK Trucking were independent contract drivers. These drivers were not obligated to work solely for Bross Trucking and in fact were almost certainly expected to have contracts with companies outside of Bross Trucking. Independent contractors' choosing to accept work from a different business is not a transfer of workers.

Bross Trucking did not transfer a developed customer base or revenue stream to LWK Trucking. Instead, Bross Trucking's customers had a choice of trucking options and chose to switch from Bross Trucking to LWK Trucking. Respondent's contention that Bross Trucking transferred a developed customer base and an established revenue stream is misleading because it suggests that the transfer was organized between Bross Trucking and LWK Trucking. It appears, however, that Bross Trucking's customers were interested in changing trucking providers because of the impending suspension, showing that the act was not a transfer of

**[\*32]** intangibles at the service provider level but a business choice made at the customer level. For example, forming LWK Trucking gave Mark Twain Redi-Mix, which shared ownership with LWK Trucking and one of Bross Trucking's primary customers, the option to use a trucking company with an untarnished reputation and clean service record. Thus, the facts support a finding that Bross Trucking did not transfer its customers but that the customers chose to use a new company because of Bross Trucking's troubled past.

In addition, Bross Trucking did not distribute any cash assets and retained all the necessary licenses and insurance to continue business. Further, Mr. Bross remained associated with Bross Trucking and was not involved in operating or owning LWK Trucking. He was free to compete against LWK Trucking and use every cultivated relationship in order to do so. In other words, the fact that Bross Trucking could have resumed its hauling business supports the view that it retained any corporate intangibles. Accordingly, there was no transfer of intangible assets because Bross Trucking's customers chose to use a different company and Bross Trucking remained a going concern.

LWK Trucking did not benefit from any of Bross Trucking's assets or relationships. LWK Trucking was independently licensed and developed a wholly new trucking company. LWK Trucking did not take a transferred basis in any

[*33] assets such as property or purchased authority. There is no indication that LWK Trucking used any relationship that Mr. Bross personally forged. The Bross sons were in a similarly close capacity to Bross Trucking's customers to develop relationships apart from Mr. Bross. Cultivating and profiting from independently created relationships are not, however, the same as receiving transferred goodwill. It is true that LWK Trucking's and Bross Trucking's customers were similar, but it does not mean that Bross Trucking transferred goodwill; instead the record shows that LWK Trucking's employees created their own goodwill.

## V. Tax Year 2006

Respondent sent Mr. and Mrs. Bross each a notice of deficiency for the 2006 tax year. Respondent determined that Mr. and Mrs. Bross undervalued the class A and class B shares of Bross Holding Group that they gave to their three sons in tax year 2006. The Brosses each timely petitioned these deficiencies in 2011 and were assigned docket Nos. 21199-11 and 21230-11. Subsequently, the parties have stipulated a value for both the class A and class B shares for Bross Holding Group for tax year 2006. In the notices of deficiency respondent calculated Mr. and Mrs. Bross' tax liability for 2006 adjusted for the unified tax credit that would have been consumed by a 2004 gift. As discussed above, neither Mr. nor Mrs. Bross gave any Bross Trucking intangibles to anyone in the 2004 tax year; thus, Mr. and Mrs.

[*34] Bross' unified tax credit was not used through gifts of Bross Trucking intangibles. Further, Mr. Bross is not liable for a section 6662 accuracy-related penalty for tax year 2006 because the adjustment attributable to negligence was improper: Mr. Bross did not give his sons Bross Trucking intangibles and was not obligated to pay tax for the alleged gifts. Accordingly, Mr. and Mrs. Bross' remaining deficiency for tax year 2006 will be calculated under Rule 155 according to the stipulated values of the class A and class B shares of Bross Holding Group.

The remaining issues are moot because Bross Trucking did not distribute assets to Mr. Bross. Accordingly, Mr. Bross did not give his sons the alleged distributed assets and neither Mr. nor Mrs. Bross was required to report a gift of the alleged distributed assets for the 2004 tax year in tax year 2006.

To reflect the foregoing,

Decisions will be entered for petitioners in docket Nos. 7710-11 and 21182-11, and under Rule 155 in docket Nos. 21199-11 and 21230-11.